## S12P1490. BROCKMAN v. THE STATE.

(739 SE2d 332)

MELTON, Justice.

A Muscogee County jury convicted Ward Anthony Brockman of felony murder and criminal attempt to commit armed robbery and recommended a death sentence for the murder after finding beyond a reasonable doubt that the murder was committed during the commission of another capital felony, to wit, armed robbery. See

OCGA § 17-10-30 (b) (2). The trial court entered judgment accordingly. See OCGA § 17-10-31 (a). Brockman's motion for new trial was denied, and he appeals. For the reasons set forth below, we affirm.[1]

## General Grounds

1. Viewed in the light most favorable to the verdict, the evidence at trial showed the following. On the night of June 26, 1990, Brockman's accomplices, Quenton Lewis, Larry Moore, and Ronald Mathis, came to the apartment in Phenix City, Alabama, where Brockman was staying with his girlfriend. Brockman and his accomplices made plans to commit several armed robberies in order to obtain enough money to pay the bond to secure the release from jail of Lewis's brother and a friend. A few days earlier, Brockman had stolen a black Chevrolet Camaro IROC-Z T-Top from a car lot in Columbus and replaced the dealer's tag with a Florida license tag, and he possessed a .38 revolver that belonged to his girlfriend and that he had previously used to commit an armed robbery.

---

[1] Brockman committed these crimes on June 27, 1990. He was originally indicted by the Muscogee County grand jury on March 12, 1991, for malice murder, criminal attempt to commit armed robbery, armed robbery, entering an automobile, and theft by taking. He was re-indicted on January 14, 1992, for malice murder, criminal attempt to commit armed robbery, armed robbery, and theft by taking. On March 30, 1992, the trial court granted Brockman's motion to sever the offenses of armed robbery and theft by taking. On June 19, 1992, the State filed written notice of its intent to seek the death penalty. Jury selection began on February 28, 1994. The jury convicted Brockman of felony murder and criminal attempt to commit armed robbery on March 11, 1994, and it recommended a death sentence for the murder the following day. The trial court sentenced Brockman in accordance with the jury's recommendation and properly merged the criminal attempt to commit armed robbery conviction into the felony murder conviction. Brockman filed a motion for new trial on April 11, 1994, which he amended on June 29, 2009, and August 3, 2009, and which the trial court denied on February 6, 2012. Brockman filed a timely notice of appeal on March 6, 2012. The appeal was docketed to the September 2012 term of this Court, and the case was orally argued on September 11, 2012.

It took far too long for the trial court to consider Brockman's motion for new trial. In its order denying Brockman's motion, the trial court attributed the delay in Brockman's postconviction proceedings, "[a]t a minimum," to the following: (1) the court reporter's death prior to the completion of the trial transcripts; (2) the replacement of one of Brockman's attorneys with current counsel in 2000; and (3) "the case going dormant in 2001 after which no hearings were held until its subsequent resurrection in 2009 and assignment to [a new trial judge] in August, 2010." The trial court's findings do not explain or excuse the 18-year interval between the entry of Brockman's sentence and the denial of his motion for new trial. Indeed,

> extended delays in proceedings on motions for new trial "put at risk the rights of defendants and crime victims and the validity of convictions obtained after a full trial," and . . . "it is the duty of all those involved in the criminal justice system, including trial courts and prosecutors as well as defense counsel and defendants, to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay."

(Citation and punctuation omitted.) *Arnold v. State*, 292 Ga. 268 (2) (b), n. 5 (737 SE2d 98) (2013). We urge both counsel and trial courts to be diligent in ensuring that cases proceed in a timely manner.

On the following day, June 27, Brockman and his accomplices also obtained a .22 pistol and a twelve-gauge sawed-off shotgun to use in the planned robberies. After obtaining the guns, they went to a Kentucky Fried Chicken restaurant to commit armed robbery against the manager when she left to make a bank deposit, but they apparently "missed" her exit from the restaurant. Then Brockman and the others drove to the Premium Oil gas station that the victim, Billy Lynn, managed, because Moore and Mathis, who were familiar with the neighborhood, believed that he carried "large amounts of money." Brockman made certain that Lynn was at the station and then dropped off Moore and Mathis a short distance away, because they feared that Lynn would recognize them. Brockman drove by the full-service station a couple of times until he found the lot empty, pulled in, and parked at approximately 5:30 p.m. When the victim approached and asked if he could help Brockman, Brockman "pulled the [.38]," "clicked it back," and told Lynn, "Give me all the money." Lynn raised his arms out to his side and told Brockman, "You got it." Brockman asked for the money again. Again Lynn said, "You got it," but he made no attempt to hand Brockman any money. According to Brockman, Lynn "had a grin on his face," and, at this point, he knew that Lynn was not going to give him the money. Brockman told Lynn, "No, you got it." Then he shot Lynn once in the abdomen, killing him. In his videotaped statement that was played at trial,[2] Brockman stated that he had the cocked revolver in his right hand and that "[he] was reaching back — [he] was going to leave, and in the process the gun shot, and [he] just drove off." Brockman also stated that Lynn would not have been harmed had he handed over the money and that Lewis did nothing but sit beside him holding the sawed-off shotgun. At trial, however, Brockman testified that Lewis was originally supposed "to get out and get the money and jump back in" but that Lewis had the barrel of the sawed-off shotgun pointed in Brockman's direction and directed him to "get the money" when Lynn approached. Brockman also testified that Lewis hit him on the shoulder while yelling at him to "go" after he had abandoned the robbery, causing him to accidentally shoot Lynn. Lewis, who testified for the State, denied that he was originally supposed to carry out the robbery, that he ever hit Brockman, and that he was holding the shotgun at the time. Lewis also testified that Brockman had not cocked the gun before shooting

---

[2] In an interim appellate review of Brockman's case, this Court held that the trial court did not err by concluding that Brockman's videotaped statement, as well as other statements made by him to police, were admissible. See *Brockman v. State*, 263 Ga. 637, 637-639 (1) (a)-(c) (436 SE2d 316) (1993).

Lynn, that he shot Lynn by pulling the trigger,[3] and that he told Lewis that he did so to prevent Lynn from "laugh[ing] about it with his buddies, telling his buddies that we tried to rob him and . . . didn't really get no money." Although Lynn had $70 in his pocket, Brockman sped away without taking any money. He stopped to pick up Moore and Mathis, to put the T-tops on the IROC, and to adjust the T-tops. During one stop, he exchanged places with Lewis.

When police responded to the 911 call reporting the shooting, nearby witnesses gave them a description of the IROC, and the officers issued a lookout for the vehicle. It was spotted by police, and a chase ensued. With Lewis now driving, Brockman and his accomplices fled through traffic at speeds of over 100 miles per hour. After eluding police in Phenix City, Brockman tried to wipe his fingerprints from the IROC, took the .38 revolver, abandoned the vehicle, and returned to his girlfriend's apartment with the others. When police approached, Brockman hid in the insulation in the attic until the officers threw tear gas into the attic and he was arrested. Authorities located the IROC and recovered fingerprints belonging to Brockman, Moore, and Lewis on the outside and a piece of paper that outlined an itinerary inside. According to Brockman, the "agenda" consisted of "things that [he] had seen and [he] had planned on doing." The list included stealing a car and robbing the gas station that Lynn managed. The State also presented evidence of three similar transactions showing that Brockman participated in three armed robberies in June 1990. Two of these transactions took place within 48 hours of the attempted armed robbery and murder of Lynn.

We find that the evidence, construed most favorably to the jury's verdicts, was sufficient to authorize a rational trier of fact to find Brockman guilty of the crimes charged beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); Unified Appeal Procedure IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

2. "[T]aking of property is an essential element of the crime of armed robbery." *Woodall v. State*, 235 Ga. 525, 533 (221 SE2d 794) (1975). See OCGA § 16-8-41 (a). Because the only statutory aggravating circumstance introduced by the State and found by the jury was that the murder was committed while Brockman was engaged in the capital felony of armed robbery, see OCGA § 17-10-30 (b) (2), and

---

[3] The revolver used to shoot Lynn was a double-action revolver that could be fired by either pulling the trigger or manually cocking it and then firing it in the same manner as a single-action revolver.

no evidence was presented that Brockman took anything during the incident, Brockman contends that the evidence was insufficient to authorize the jury to conclude that the State had proven the existence of a statutory aggravating circumstance. However, "a murder may be found to have been committed while the murderer was 'engaged in the commission' of an armed robbery even if the attempted armed robbery fails or is otherwise abandoned." *Tate v. State*, 287 Ga. 364, 368 (5) (695 SE2d 591) (2010) (citing *Amadeo v. State*, 243 Ga. 627, 631 (255 SE2d 718) (1979)). The evidence supported the jury's finding of the existence of the required statutory aggravating circumstance here, and, as explained more fully below, Brockman's argument to the contrary is without merit.

OCGA § 17-10-30 (b) (2) specifies as a statutory aggravating circumstance that the murder "was committed while the offender was engaged in the commission of another capital felony,[4] or aggravated battery, or . . . while the offender was engaged in the commission of burglary in any degree or arson in the first degree." However, the statute does *not* require that the other felony be completed. See *Roberts v. State*, 252 Ga. 227, 241 (14) (314 SE2d 83) (1984). Nor does the statute require that the defendant be charged with or *convicted* of the other felony. See, e.g., *Hooks v. State*, 233 Ga. 149, 151 (5) (210 SE2d 668) (1974), vacated in part on other grounds by 433 U. S. 917 (97 SC 2994, 53 LE2d 1104) (1977). What the statute does require is that the State prove beyond a reasonable doubt the existence of the statutory aggravating circumstance for purposes of *sentencing*, i.e., that the murder was committed "while the offender was engaged in the commission of" the other felony. OCGA § 17-10-30 (b) (2), (c). The State is required to do so regardless of whether or not the defendant has been convicted of the other felony in the guilt/innocence phase. See *Romine v. State*, 256 Ga. 521, 528 (3) (350 SE2d 446) (1986). Establishing that the murder was committed "while the offender was engaged in the commission of" an armed robbery in this case is what made Brockman eligible for the death penalty, *not* the commission of the criminal attempt to commit armed robbery. Brockman's argument misconstrues that fact.

The evidence was sufficient to support the jury's finding of the alleged statutory aggravating circumstance, not because Brockman was convicted of the criminal *attempt* to commit armed robbery, but because the jury was authorized to conclude beyond a reasonable

---

[4] Armed robbery is a "capital felony" for the purpose of OCGA § 17-10-30 (b) (2). See *Peek v. State*, 239 Ga. 422, 432 (III) (b) (238 SE2d 12) (1977) (construing "capital felony" in the predecessor to this provision "in a generic sense to include those felonies which were capital crimes in Georgia at the time this section of our death penalty statute was enacted").

doubt from the evidence presented at trial that he was *engaged in the commission of an armed robbery* at the time that he murdered the victim and, thus, that the requirements of the (b) (2) statutory circumstance had been established. It is true that some of the same facts may go to prove both the criminal attempt to commit armed robbery and the (b) (2) circumstance, because one of the essential elements of the crime of attempt to commit armed robbery is that the accused "perform[ ] any act which constitutes a substantial step toward the commission of that crime." OCGA § 16-4-1. However, it is a question of fact whether "[an] act which constitutes a substantial step toward the commission of" armed robbery *also* constitutes "while . . . engaged in the commission of" armed robbery, so that that act becomes a statutory aggravating circumstance authorizing the imposition of the death penalty. See *People v. Walker*, 440 NE2d 83, 87 (Ill. 1982) (death penalty statute then in effect providing that a defendant found guilty of murder "may be sentenced to death if . . . the murdered individual was killed in the course of" certain enumerated felonies "does not require that the other felony be completed or that the defendant be charged with or convicted of the other felony or an attempted felony");[5] *State v. Brett*, 892 P2d 29, 43-44 (Wash. 1995) (same). See also *State v. Humphries*, 479 SE2d 52, 54-55 (S.C. 1996) (holding that statutory language including as an aggravating circumstance any murder carried out " 'while in the commission of . . . robbery while armed with a deadly weapon' " includes attempted armed robbery). Accordingly, we reject Brockman's contention that there was insufficient evidence to support the jury's finding of the (b) (2) statutory aggravating circumstance that he was engaged in the commission of an armed robbery during the commission of the murder.

3. Brockman also contends that this Court's construction of the (b) (2) statutory aggravating circumstance fails to limit the situations in which the death penalty can be sought and fails to channel the sentencer's discretion by clear and objective standards. See *Godfrey v. Georgia*, 446 U. S. 420, 428 (100 SC 1759, 64 LE2d 398) (1980). We disagree. Allowing the uncompleted felonies listed in OCGA § 17-10-30 (b) (2) to constitute statutory aggravating circumstances *does* narrow the class of death eligible defendants and provide sufficient guidance to juries as to what constitutes an aggravating circumstance. The

---

[5] The Illinois statute was subsequently amended to make that explicit. See 720 ILCS 5/9-1 (b) (6) (c). Although the Illinois General Assembly recently abolished the death penalty, see 725 ILCS 5/119-1, we still find *Walker* relevant in that it shows how another court construed a statute similar to OCGA § 17-10-30 (b) (2) to allow certain attempted felonies to constitute statutory aggravating circumstances of murder.

class includes those persons who commit murders "while . . . engaged in the commission of another capital felony or aggravated battery, or . . . while . . . engaged in the commission of burglary in any degree or arson in the first degree." OCGA § 17-10-30 (b) (2). Therefore, this contention is also meritless.

4. Brockman contends that the trial court erred by failing to exercise its discretion and decide on the merits whether he is entitled to a new trial pursuant to OCGA §§ 5-5-20 and 5-5-21. OCGA § 5-5-20 authorizes the trial court to grant a new trial "[i]n any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity." Similarly, OCGA § 5-5-21 authorizes the trial court to grant a new trial "where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding." These statutes provide the trial court with the broad discretion to sit as a "thirteenth juror" and weigh the evidence on a motion for new trial alleging these general grounds. See *Ricketts v. Williams*, 242 Ga. 303, 304 (248 SE2d 673) (1978). Brockman raised a claim under these provisions with respect to both his convictions and death sentence in his motion for new trial. Therefore, the trial court had an affirmative duty to exercise its discretion and weigh the evidence to determine whether a new trial as to his convictions or his death sentence was warranted. See *Ricketts v. Williams*, 240 Ga. 148, 149 (240 SE2d 41) (1977), vacated on other grounds, 438 U. S. 902 (98 SC 3119, 57 LE2d 1145) (1978); *Kendrick v. Kendrick*, 218 Ga. 460, 460 (1) (128 SE2d 496) (1962). Brockman contends that the trial court failed to exercise its discretion and, thus, that this Court should vacate the motion for new trial order and remand to the trial court for it to fulfill its affirmative statutory duty. See *State v. Jones*, 284 Ga. 302, 303-304 (2) (667 SE2d 76) (2008). Brockman is incorrect.

(a) In support of his contention, Brockman first cites the fact that the trial court adopted the State's proposed order verbatim. We reject Brockman's contentions both that it was a denial of due process and his Eighth Amendment rights for the trial court to adopt the State's proposed findings and that the trial court's adoption of the State's proposed findings is evidence that the trial court failed to exercise its discretion under OCGA §§ 5-5-20 and 5-5-21.

" '[W]hen the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.'" *Rafi v. State*, 289 Ga. 716, 721 (5) (715 SE2d 113) (2011) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U. S. 564, 572 (II) (105 SC 1504, 84 LE2d 518) (1985)). Brockman has failed to show that the adopted order contained clearly erroneous findings. Furthermore, even "[o]rders prepared ex parte do not violate due process and

should not be vacated unless a party can demonstrate that the process by which the judge arrived at them was fundamentally unfair." *Fuller v. Fuller*, 279 Ga. 805, 806 (621 SE2d 419) (2005) (citation and punctuation omitted). In Brockman's case, after both parties had been given the opportunity to fully brief the issues, they were simultaneously informed that, *after review*, the trial court had decided to deny the motion for new trial and was requesting that the State prepare a proposed order. Defense counsel were provided an opportunity to respond to the proposed findings and conclusions. Brockman has presented no evidence that the trial court did not fully review the evidence and consider Brockman's claims or that the process by which the trial court arrived at its findings was fundamentally unfair. Accordingly, we reject Brockman's contentions regarding the trial court's adoption of the State's proposed order.

(b) Brockman also contends that the order itself indicates that the trial court simply reviewed the evidence at both phases of trial for sufficiency of the evidence under the standard in *Jackson v. Virginia*, supra, and failed to exercise its discretion under OCGA §§ 5-5-20 and 5-5-21. See *Williams*, supra, 242 Ga. at 303 (grant of a new trial on the discretionary ground that the verdict is against the weight of the evidence is not a finding that the evidence is legally insufficient). We disagree. The order's language clearly shows that the trial court made two separate determinations, a determination as to the sufficiency of the evidence under the *Jackson v. Virginia* standard and a discretionary determination under OCGA §§ 5-5-20 and 5-5-21, as to the guilt/innocence verdict and the sentencing verdict.[6] Even though the trial court did not explicitly cite OCGA §§ 5-5-20 and 5-5-21, the language used by the trial court in its discretionary determinations that the evidence at trial was not *"sufficiently close"* to warrant the grant of a new trial as to either the guilt/innocence or the sentencing verdicts indicates that the trial court did in fact exercise its discretion under the relevant statutory provisions. See OCGA § 5-5-42 (c) and (d) (setting forth the suggested "form for motion for new trial in criminal cases" and providing as one of the enumerated grounds for the granting of a new trial that, "[a]lthough the state proved the

---

[6] To the extent that Brockman's contention that the trial court did not exercise its discretion in weighing the evidence in the sentencing phase is based on his argument that a weighing of the evidence would have necessarily resulted in a determination that the sentencing verdict was contrary to and against the weight of the evidence because the facts cannot support armed robbery and, thus, cannot support the jury's finding of the (b) (2) circumstance that the murder was committed during the commission of an armed robbery, see Division 2 above.

defendant's guilt beyond a reasonable doubt, the evidence was *sufficiently close* to warrant the trial judge to exercise his discretion to grant the defendant a retrial" (emphasis supplied)). This language is regularly used to describe the standard of review used in a trial court's grant of a new trial on the discretionary ground that the verdict is against the weight of, or contrary to, the evidence. See *Colzie v. State*, 289 Ga. 120, 121 (1) (710 SE2d 115) (2011); *Smith v. State*, 265 Ga. 495, 496 (5) (458 SE2d 347) (1995), overruled in part on other grounds by *Smith v. State*, 268 Ga. 196, 200, n. 5 (486 SE2d 819) (1997). In light of the foregoing, "we must conclude that there was no intention to evade the exercise of a sound legal discretion in passing on the motion for a new trial." *Martin & Sons v. Bank of Leesburg*, 137 Ga. 285, 291 (73 SE 387) (1911) (citation omitted). Therefore, Brockman's contentions are without merit, and there is no need for a remand.

5. The original court reporter passed away before completing the transcription and certification of the trial transcript, and the trial transcript was not completed until approximately four years after the jury returned its sentencing verdict. Brockman contends that his rights to due process and a meaningful appeal were violated as a result.

(a) Brockman first contends that his appeal has been delayed as a result of the delayed filing of the trial transcript. However, he filed his amendment to his motion for new trial detailing errors beyond the general grounds *eleven years* after receiving the complete transcript, and he has failed to show how the delay in the filing of the trial transcript has harmed him. Compare *Wade v. State*, 231 Ga. 131, 133 (I) (200 SE2d 271) (1973) (holding that a defendant was denied his right to appeal and was thus entitled to a new trial where the State was unable to file a transcript because notes from which the transcript was to be prepared had been destroyed). While, as Brockman contends, the late filing of the transcript was not in compliance with the Unified Appeal Procedure, see UAP IV (A) (1) (generally requiring that a complete transcript of a death penalty case be filed within 45 days from the jury's sentencing phase verdict), Brockman has failed to show how he was prejudiced. See *Thomason v. State*, 268 Ga. 298, 305 (4) (486 SE2d 861) (1997) (finding no reversible error where the defendant was not harmed as a result of the trial court's non-compliance with the UAP).

(b) Citing *Griffin v. Illinois*, 351 U. S. 12, 16-20 (76 SC 585, 100 LE 891) (1956) (when a state conditions an appeal from a conviction on the provision of a trial transcript, the state must furnish free transcripts to indigent defendants who seek to appeal), Brockman also contends that he has been made to unconstitutionally bear the

burden of determining the accuracy of the transcript and that it is impossible to do so because a court reporter other than the reporter who was present at trial prepared the transcript using the deceased court reporter's notes. However, the trial court acted properly in appointing a successor court reporter to transcribe the trial tapes after the death of the original court reporter. See *Wilson v. State*, 246 Ga. 672, 675-676 (273 SE2d 9) (1980). The successor court reporter certified that the trial transcript "constitute[s] a true, accurate and complete transcript of the notes of [the original reporter]," and the trial transcript as certified by the court reporter is presumed to be true, complete, and correct. See id. at 675; OCGA § 15-14-5. Thus, Brockman does not bear the burden of proving that the transcript is accurate.

While Brockman rightly contends that numerous exhibits were missing from the record when his case was docketed in this Court, a supplement to the record was received in this Court prior to oral argument, and the only exhibits that remain missing are a State's exhibit consisting of a photograph regarding a line-up in a similar transaction and three defense exhibits that are mitigation photographs. All of the missing exhibits were adequately discussed in testimony. See *Foster v. State*, 178 Ga. App. 478, 481 (2) (343 SE2d 745) (1986). Further, Brockman does not rely on *any* of the missing exhibits in his enumerations of error and thus has not shown that they are material to his appeal. See *Strickland v. State*, 260 Ga. 28, 30 (8) (389 SE2d 230) (1990). Accordingly, Brockman has not established that he was prevented from raising any viable issue on appeal as a result of any inaccuracy of the trial transcript, nor has he shown any other harm. See id. Thus, this contention provides him no relief.

### *Pretrial Issues*

6. Brockman contends that the trial court erred by denying his request for funds for independent expert mental health assistance in preparing mitigation evidence. Brockman's presentation to the trial court in support of this motion consisted of a cover letter and two pages of progress notes from a family counseling center. The cover letter stated that three counselors provided "counseling" to Brockman's family over a period of approximately five months in 1988. The letter never mentioned Brockman, and the progress notes mentioned him by name only three times and made no mention of any mental health issues or drug or alcohol abuse. The trial court initially ruled that Brockman had not met his burden under *Ake v. Oklahoma*, 470 U. S. 68, 83-87 (105 SC 1087, 84 LE2d 53) (1985) (indigent defendant has the burden to make a preliminary showing that his sanity will be

a significant factor at trial in order to be entitled to expert assistance). However, the trial court reserved its final ruling regarding the disposition of Brockman's motion, offered Brockman the opportunity to be evaluated by a state psychiatrist in order to further develop evidence for his claim, and stated that it was willing to revisit the issue after the evaluation. When Brockman chose not to accept the trial court's offer, the trial court denied his motion. We find no error. Compare *Bright v. State*, 265 Ga. 265, 275-276 (2) (e) (455 SE2d 37) (1995) (trial court erred in failing to grant a capital murder defendant expert mental health assistance in preparing mitigation evidence, given his contention that he compulsively murdered two grandparents with whom he had good relationships and his evidence regarding his depression, suicidal thoughts, poor impulse control, severe drug dependency, and severe intake of drugs and alcohol on the night of the murders).

### *Jury Selection Issues*

7. Brockman complains that the trial court erred by excusing three prospective jurors based on the trial court's determination that they evidenced an inability to consider a death sentence. On the other end of the spectrum, Brockman also contends that the trial court erred by refusing to excuse three prospective jurors, because they would automatically vote to impose the death penalty.

This Court has explained the death qualification of prospective jurors as follows:

> [T]he proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. This standard does not require that a juror's bias be proved with unmistakable clarity. Instead, the relevant inquiry on appeal is whether the trial court's finding that a prospective juror is disqualified is supported by the record as a whole. An appellate court . . . must pay deference to the trial court's determination. This deference encompasses the trial court's resolution of any equivocations and conflicts in the prospective jurors' responses on voir dire. Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion. The same standard applies to a court's decision to qualify a prospective juror over defendant's objection.

*Humphreys v. State*, 287 Ga. 63, 71-72 (5) (694 SE2d 316) (2010) (citations and punctuation omitted). Applying these standards below, we find no error.

(a) Juror Thomas indicated that he was opposed to capital punishment and repeatedly stated that he would not under any circumstances consider or vote to impose a death sentence as a sentencing option for a defendant found guilty of murder. Nevertheless, when examined by defense counsel, Juror Thomas indicated that he could follow his oath as a juror and the court's instructions. When the trial court questioned him in order to resolve this conflict, Juror Thomas initially appeared to be confused but subsequently reaffirmed that he would never vote to impose the death penalty regardless of what the facts in the case were. A juror who expresses a willingness to follow his oath and the court's instructions, "but who is substantially impaired, at the outset of the trial, in his or her ability to ever actually *vote to impose* one of the possible sentences is not qualified to serve." *Rice v. State*, 292 Ga. 191 (4) (l) (733 SE2d 755) (2012) (citation omitted; emphasis in original). The trial court did not abuse its discretion in excusing this juror.

(b) Juror Love initially stated that she was opposed to the death penalty but could consider both a death sentence and a life sentence. However, after the bifurcated trial procedure was explained to her and she learned that she would always have a choice as to what punishment to impose, she repeatedly stated that she could not vote to impose the death penalty and that she "would only consider" a life sentence. The trial court did not abuse its discretion in excusing this juror.

(c) Juror Andrews also initially stated that she was opposed to the death penalty but indicated that she could consider all sentencing options. On examination by the State, however, she twice indicated that she would exclude at the outset the possibility of imposing a death sentence. Then she equivocated again. However, when asked whether she could come into court and announce her vote to impose a death sentence, she stated that she could not. See *Isaacs v. State*, 259 Ga. 717, 730-731 (23) (386 SE2d 316) (1989) ("[A]greeing to a sentencing verdict is a part of every juror's duty, since a poll of the jury is required at the sentencing phase of a death penalty trial." (citing UAP III (B) (3) (b)). Juror Andrews also twice stated, "I'm going to do all I can to vote against [the death penalty]." After it was explained to her that a juror always has the option of voting for a life sentence, regardless of the circumstances of the case, Juror Andrews stated that she did not think that she would vote for the death penalty under any circumstances. Considering the entirety of the extensive and thorough voir dire of this juror, we conclude that the trial court did not

abuse its discretion in finding that she was substantially impaired and, thus, was not qualified to serve. See *Presnell v. State*, 274 Ga. 246, 249 (3) (a) (551 SE2d 723) (2001) (a juror's bias for or against the death penalty need not be proven with unmistakable clarity).

(d) Brockman also contends that the trial court's excusal of Jurors Thomas, Love, and Andrews prohibited them from holding a public trust based on their religious opinions regarding the death penalty in violation of the First Amendment and the State constitution. See Ga. Const. of 1983, Art. I, Sec. I, Pars. III and IV. Brockman has not cited to the record to show that these jurors stated that their opposition to the death penalty was based on their religious beliefs, and our review of the record has failed to reveal any clear support for such a conclusion. Furthermore, "[t]here is no violation of the constitutional right to freedom of religion and conscience where a juror is stricken for cause based upon death penalty views that are derived from religion." *King v. State*, 273 Ga. 258, 267 (20) (539 SE2d 783) (2000) (citation omitted). See *Cromartie v. State*, 270 Ga. 780 (514 SE2d 205) (1999). Brockman's contention that the death qualification of jurors violates a defendant's right to an impartial jury drawn from a representative cross-section of the community is also without merit. See *DeYoung v. State*, 268 Ga. 780, 790 (11) (493 SE2d 157) (1997) (citing *Lockhart v. McCree*, 476 U. S. 162 (106 SC 1758, 90 LE2d 137) (1986)).

(e) Brockman contends that a totality of Juror Eason's responses indicated that he would always vote to impose a death sentence for a defendant found guilty of murder and did not think that defense counsel could change his mind, and he contends that Juror Eason's alleged beliefs were due to his having previously served as a military policeman. He also contends that a totality of the responses of Jurors Caraway and Schnipper demonstrated that their "strong" belief in the death penalty would prevent them from considering mitigating evidence and the imposition of a life sentence.

Our review of the record reveals that Juror Caraway became ill and was excused by the trial court before jury selection began. Thus, Brockman's claim that he was improperly qualified is moot. See *Lawler v. State*, 276 Ga. 229, 235 (5) (576 SE2d 841) (2003). When viewed as a whole, the voir dire of Jurors Eason and Schnipper shows that, while they indicated a leaning toward the death penalty, they would listen to all the evidence and would fairly consider both sentencing options. See *Pace v. State*, 271 Ga. 829, 834 (7) (524 SE2d 490) (1999) ("A prospective juror is not subject to excusal for cause for merely leaning for or against a death sentence."). There was no evidence that Juror Eason's service as a military policeman from 1956 to 1958 would have any impact on his ability to serve as a fair

and impartial juror in Brockman's case over 35 years later. See *Potts v. State*, 261 Ga. 716, 722 (8) (410 SE2d 89) (1991) (finding no error in the trial court's denial of a motion to excuse for cause two potential jurors who were former law enforcement officers). Compare *Terrell v. State*, 271 Ga. 783, 783-784 (1) (523 SE2d 294) (1999) (reversing a defendant's convictions because the trial court failed to excuse for cause an active-duty military policeman). Based on the totality of these jurors' responses, the trial court was authorized to find that they were qualified to serve on the jury. See *Presnell*, supra, 274 Ga. at 251 (4); *Mize v. State*, 269 Ga. 646, 652 (6) (d) (501 SE2d 219) (1998).

Brockman also contends that the trial court unduly restricted the voir dire of Jurors Eason and Schnipper and improperly rehabilitated them. However, he raised no such objections at the time of their voir dire and, thus, has not preserved these issues for appeal. See *Ledford v. State*, 289 Ga. 70, 82 (9) (d) (709 SE2d 239) (2011) (defendant waived his claim regarding any alleged limitation of his voir dire of a juror where he failed to object at the time of the trial court's interruption). Moreover, "[w]e conclude that the trial court's targeted questions to the challenged jurors aided the court in resolving the equivocations and conflicts in their responses" and that the defense was allowed ample opportunity to voir dire the jurors. *O'Kelley v. State*, 284 Ga. 758, 765 (2) (e) (670 SE2d 388) (2008) (citations omitted).

8. Brockman contends that the trial court improperly restricted his voir dire in several ways. However, he raised no objections on the stated grounds at the time of voir dire and, thus, has not preserved these issues for appeal. See *Ledford*, supra, 289 Ga. at 82 (9) (d). Even if he had not waived these objections, however, we would find no error. "Control of the voir dire examination is within the sound discretion of the trial court and the court's discretion will not be interfered with unless the record shows a manifest abuse of that discretion." *Bramble v. State*, 263 Ga. 745, 745 (2) (438 SE2d 619) (1994) (citation omitted). After viewing the record, we conclude that the voir dire in this case was sufficient to ascertain the fairness and impartiality of the prospective jurors. See *Bryant v. State*, 288 Ga. 876, 880 (4) (a) (708 SE2d 362) (2011); *Sallie v. State*, 276 Ga. 506, 510 (3) (578 SE2d 444) (2003); *Pace*, supra, 271 Ga. at 836 (14) (trial court did not abuse its discretion in refusing to permit a defendant to question jurors about bumper stickers on their cars); *Carr v. State*, 267 Ga. 547, 554 (6) (a) (480 SE2d 583) (1997) (it is improper "to require the juror to enumerate hypothetical circumstances in which she might or might not vote to impose the death penalty").

9. Brockman contends that the trial court erred by qualifying several jurors who were biased toward the State. ·

> Whether to strike a juror for cause lies within the sound discretion of the trial court. For a juror to be excused for cause, it must be shown that he or she holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence. A prospective juror's doubt as to his or her own impartiality does not demand as a matter of law that he or she be excused for cause. Nor is excusal required when a potential juror expresses reservations about his or her ability to put aside personal experiences. . . . A conclusion on an issue of bias is based on findings of demeanor and credibility which are peculiarly in the trial court's province, and those findings are to be given deference.

*Holmes v. State*, 269 Ga. 124, 126 (2) (498 SE2d 732) (1998) (citations omitted). Applying those principles to the challenged jurors, we find no error, as none of the jurors' responses during voir dire showed a compelling bias or interest in the case.

(a) Two prospective jurors stated that they knew witnesses on the State's witness list. Juror Baker volunteered that he knew a police officer on the State's witness list "slightly" and that he was friends with an individual who had the same name as another witness on the list but did not know whether they were the same individual. In support of his contention that Juror Baker should have been excused for cause, Brockman points to the following exchange between defense counsel and the juror regarding these potential witnesses:

> Q. If they take the stand and testify to something, are you going to believe them just because it's them, no matter what they say?
> A. I wouldn't — no, sir, I wouldn't believe them no matter what they said, I don't think. But I think if — they are honorable men as far as I know. If they were up there testifying, under oath, I would believe them.
> Q. So, if they testified under oath, you would believe whatever they had to say?
> A. I believe, yes, I think so.

Brockman contends that Juror Baker's response shows that he would

"automatically" believe "whatever" these witnesses testified to and thus was not impartial and should have been excused for cause.

However, the fact that this juror expressed a belief in the credibility of these witnesses under oath did not require that he be excused for cause. See *Brown v. State*, 268 Ga. 354, 356 (3) (490 SE2d 75) (1997). A review of his entire voir dire shows that he also indicated that he would weigh their testimony like that of any other witnesses, that he would not be inclined to believe them more than any other witnesses, and that his relationship with both witnesses would not affect how he viewed the evidence. The trial court did not abuse its discretion by denying the motion to strike this juror. See *Mize*, supra, 269 Ga. at 651-652 (6) (a) (finding that a juror was properly qualified where the juror stated that she would be "hard pressed" to believe that officers she knew on the State's witness list would fabricate evidence but that she would judge their credibility and the case based on the evidence and the court's instructions).

Brockman also contends that Juror Still should have been excused for cause because he stated that he would, under any circumstances, believe the testimony of a possible State's witness whom he knew. Our review of the record shows that Juror Still was among the jurors from whom the alternate jurors were selected. Because no alternates participated in deliberations in Brockman's case, we need not address whether the trial court erred by refusing to excuse him. See *Heidler v. State*, 273 Ga. 54, 57 (3) (c) (537 SE2d 44) (2000).

(b) During voir dire, Juror Smart volunteered that a co-worker told him in a "casual conversation" the previous week that his brother was the victim of a killing and that the upcoming murder trial could be his brother's case, and the juror stated that that was "the extent" of the conversation. The victim in this case was in fact the brother of Juror Smart's co-worker. Brockman contends that the juror should have been excused for cause because of his relationship with the victim's brother and that the trial court improperly rehabilitated this juror.

During voir dire, Juror Smart described himself as being analytical and objective. When questioned regarding the possible effect his relationship with the victim's brother would have on his ability to be a juror in Brockman's case, the juror stated that he thought that he could be fair in his consideration of the evidence, that he believed that he could put aside the fact that he worked with the victim's brother and view the evidence objectively, and that the facts that he knew the victim's brother, had talked with him briefly about the case, and would continue to work with him after the trial was over would not "[c]onsciously" influence him if called upon as a juror to determine

an appropriate punishment. Juror Smart did state, however, that he could not say whether the relationship would influence him "[s]ubconsciously." In response to further questioning by defense counsel, Juror Smart stated that he could not put completely out of his mind the fact that he worked with the victim's brother. The trial court interrupted and stated that, "no one can put something completely out of . . . his conscious mind" but that he just wanted to be certain that the juror, who "seem[ed] to be an analytical sort of person," could "try to retain objectivity in the case." The trial court then asked the juror if he felt that he could "override" any conscious feelings that he had because of the relationship and decide Brockman's case based upon the evidence presented and the law as given by the trial court, and Juror Smart indicated that he could. Although Brockman contends that the trial court improperly rehabilitated the juror, the juror had previously stated that he tended to be analytical, that he could be fair about the case, and that his relationship with the victim's brother would not consciously affect his ability to be impartial in deciding an appropriate punishment. Thus, the trial court's question did not instruct the juror on the correct answer as Brockman contends but, instead, called upon him to clarify and reaffirm what he had already stated — that he could put aside the relationship and decide the case based on the evidence and the court's instructions. Thus, there was no error.

Brockman also contends that Juror Smart could not be impartial as a result of having heard a speech by the District Attorney at his civic club after having received his jury summons. However, the name, facts, or circumstances of Brockman's case were not mentioned, and Juror Smart stated that the speech had not influenced him with regard to his impartiality in the case. "The law presumes that potential jurors are impartial." *Cohen v. Baxter*, 267 Ga. 422, 424 (2) (479 SE2d 746) (1997). After reviewing the record, we conclude that Brockman failed to meet his burden of rebutting this presumption and, therefore, that the trial court did not abuse its discretion in refusing to remove this juror. See id.

(c) Brockman contends that the trial court erred in qualifying Juror Cooper without giving defense counsel adequate opportunity to establish the extent to which his employment as an armored car guard would impair his ability to be fair and impartial. During voir dire, Juror Cooper indicated that his experience as an armored car guard would not substantially impair his ability to serve as a juror in Brockman's case, and defense counsel asked "to what degree" he thought that he might be impaired. After Juror Cooper indicated that he did not know how to answer that question, defense counsel insisted that he needed to "have an idea of [Juror Cooper's] best feeling about

it, one way or the other." While the trial court sustained the State's objection to this line of questioning, the court allowed defense counsel to ask Juror Cooper whether he felt that his employment experience would in fact impair his ability to be impartial *to any degree.* Although Juror Cooper responded that "[t]he thought is always going to be there," he again stated that his employment experience would not substantially impair his ability to serve as a juror. He also stated that he had no leaning between the State and the defendant and that he was "totally impartial at this time" between the two parties. Furthermore, Juror Cooper had no prior knowledge of Brockman's case and had never been a victim of an armed robbery, an attempted armed robbery, or any other crime. The trial court did not abuse its discretion by unduly restricting the scope of Juror Cooper's voir dire or by refusing to excuse him. See *Gissendaner v. State*, 272 Ga. 704, 709 (4) (532 SE2d 677) (2000) (finding no error in the trial court's limiting repetitive questions); *Holmes*, supra, 269 Ga. at 126 (2) (excuse is not required when a potential juror expresses reservations about his or her ability to put aside personal experiences). See also *Cromartie*, supra, 270 Ga. at 784-785 (9) (c) (finding no abuse of discretion in the refusal to excuse for cause two potential jurors with business connections to the convenience store industry in a trial of a defendant charged with the armed robbery and murder of a convenience store clerk, where the jurors stated that they could render a verdict based solely on the evidence).

10. Upon our review of the record, we reject Brockman's argument that the trial court abused its discretion by refusing to excuse two potential jurors for reasons of hardship. While one of these jurors stated that he did not think that he could devote his full attention to the evidence because of concerns about his business, he also stated that his concerns would not interfere with his ability to render a verdict. Moreover, we find nothing in either juror's responses indicating that they would not be fair and impartial jurors. Therefore, this contention affords Brockman no relief. See *Stinski v. State*, 286 Ga. 839, 847 (32) (691 SE2d 854) (2010).

*Guilt/Innocence Phase Issues*

11. Lewis, Brockman's co-indictee, testified for the State pursuant to a plea agreement. Brockman contends that the trial court improperly restricted his cross-examination of Lewis when, in an attempt to impeach Lewis, defense counsel attempted to question him concerning the disposition of two criminal indictments against his brother. "Defense counsel is entitled to a reasonable cross-examination on the relevant issue of whether the witness entertained

any belief of personal benefit from testifying favorably for the prosecution." *State v. Vogleson*, 275 Ga. 637, 639 (571 SE2d 752) (2002). See also OCGA § 24-6-622. However, " 'the extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court,' " so long as the court does not cut off all inquiry on a subject that the defense is entitled to cross-examine on. Id. at 639-640 (citation omitted).

Here, the trial court gave Lewis the opportunity to show the relevance of his desired inquiry by allowing defense counsel to ask Lewis outside the jury's presence if he had any knowledge of the indictments against his brother and any deals that his brother was given regarding the charges. Defense counsel refused that opportunity, and Brockman has not shown that Lewis had any knowledge of the disposition of his brother's indictments or that there was any evidence that Lewis believed that his brother received favorable treatment as a " 'result of [Lewis's] cooperation'" or due to " 'decisions made by the district attorney in exchange for [Lewis's] cooperation and testimony for the State.' " *Manley v. State*, 287 Ga. 338, 340-341 (698 SE2d 301) (2010) (citation omitted). See *Hampton v. State*, 289 Ga. 621, 626-627 (5) (713 SE2d 851) (2011). Brockman also declined the opportunity presented by the trial court to ask Lewis in the jury's presence whether he received any promises of lenience for his brother if he cooperated in Brockman's case. Moreover, Lewis had already testified that he received a plea agreement with the State in exchange for his testimony against Brockman reducing the charge of murder to voluntary manslaughter with the State recommending a sentence of thirty years, with twenty years to be served in prison. Thus, any benefit his brother may have received would have been largely irrelevant to Lewis's credibility. The trial court did not abuse its broad discretion to control cross-examination in this case.

12. Brockman chose to testify in the guilt/innocence phase. During cross-examination, the prosecutor asked, "Now, you remember in your videotaped statement to Detective Boren you said something also about an old filling station in Harris County?" Before Brockman responded, defense counsel objected on the basis that he believed that the referenced incident had been excluded and thus redacted from the videotaped statement before the jury viewed it,[7] and he moved for a mistrial. The trial court recognized the inference that could arise from the prosecutor's question since it came during

---

[7] Our review of the trial transcript shows that Brockman *did* state in the portion of the videotape played at trial that "there's an old gas station way out in Harris County that was probably on the list [of burglaries that he planned on doing]."

testimony about previous robberies in which Brockman was involved, but it denied Brockman's motion, finding that the prosecutor's question standing alone was "entirely without any value, probative or otherwise," and did not inculpate Brockman. The trial court also noted that Brockman's "agenda" listed the gas station in Harris County and was already in evidence. Brockman refused the trial court's offer to give curative instructions, and we find no abuse of discretion in the court's denial of his motion for mistrial. See *Brinson v. State*, 289 Ga. 551, 552 (2) (713 SE2d 862) (2011) (stating that the denial of a motion for a mistrial ordinarily amounts to an abuse of discretion only when "it is apparent that a mistrial is essential to the preservation of the right to a fair trial") (citation and punctuation omitted).

13. During cross-examination, the prosecutor also asked Brockman what he would have done during a previous robbery if the victim had not given him the money and whether he intended to call his girlfriend and his accomplices, Moore and Mathis, to testify. The trial court sustained Brockman's objections to each of these questions, and Brockman asked for no additional relief. Brockman contends that the prosecutor's questions introduced prejudicial matters not in evidence and that the trial court erred when it failed to carry out its duty under OCGA § 17-8-75 to rebuke the prosecutor and give curative instructions. See *O'Neal v. State*, 288 Ga. 219, 220-221 (1) (702 SE2d 288) (2010) (OCGA § 17-8-75 requires the trial court to rebuke the prosecutor and give a curative instruction following an objection to statements of prejudicial matters not in evidence, even in the absence of a request by opposing counsel).

Because defense counsel interposed objections immediately after these questions and the objections were sustained by the trial court, Brockman did not answer any of the complained-of questions. Furthermore, the subject matter of the questions was already in evidence, as the questions only mentioned persons or matters that the State had presented evidence about in its case-in-chief. Therefore, the prosecutor's questions did not amount to forbidden prejudicial statements within the meaning of OCGA § 17-8-75. See *Dolphy v. State*, 288 Ga. 705, 708 (2) (b) (707 SE2d 56) (2011). In any event, reversal is not required, because any error would have been harmless. See *O'Neal*, supra, 288 Ga. at 223 (1). Given the overwhelming evidence of Brockman's guilt and the trial court's instructions that the defendant has no burden to prove his innocence and that the attorneys' statements are not evidence, it is highly probable that any alleged error in failing to comply with OCGA § 17-8-75 did not contribute to the verdicts. See *Dolphy*, supra, 288 Ga. at 708 (2) (b).

14. Brockman contends that the prosecutor made improper arguments at the close of the guilt/innocence phase that require reversal of his conviction and death sentence.

(a) The prosecutor argued the following about defense counsel:

He's a good fellow, and he is a friend of mine, but he's paid to represent this man. He's not paid to find justice. He's not paid to be a judge. He's not paid to prosecute. He's paid to represent Ward Brockman, and that's what he's doing. . . . He ain't out for justice. He is out mercy [sic] or he is out for you to forgive his client.

Brockman contends that these remarks constituted an improper attack on defense counsel's credibility. Because no objections were raised to these statements, Brockman's contention is waived insofar as it concerns the jury's determination of his guilt. See *Gissendaner*, supra, 272 Ga. at 713 (10) (b). However, we have considered the allegedly improper arguments in determining whether Brockman's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, see OCGA § 17-10-35 (c) (1), and "we find distasteful any argument that unnecessarily impugns the integrity of opposing counsel, even if obliquely." *Gissendaner*, supra, 272 Ga. at 713 (10) (a). Nevertheless, we conclude that there is no reasonable probability that the prosecutor's allegedly improper arguments changed the jury's exercise of discretion in choosing between life imprisonment or death (see id. at 714 (10) (b)), as the trial court charged the jury that evidence does not include the attorneys' closing arguments.

(b) The prosecutor also argued the following:

[Lewis] wasn't impeached by showing that he said something different to Detective Boren out there on the day he was arrested. Now, we can't come in and play his videotape for you. We have to put the man up himself —

At that point, defense counsel objected on the ground that the prosecutor was introducing evidence that had been ruled inadmissible by the trial court, and the trial court sustained the objection. Brockman contends that the trial court erred by failing to rebuke the prosecutor and give a curative instruction or declare a mistrial pursuant to its duty under OCGA § 17-8-75. See *O'Neal*, supra, 288 Ga. at 221-222 (1).

Before the close of evidence, the trial court had denied the State's motion to introduce Lewis's videotaped statement to Boren as a prior

consistent statement. See *Woodard v. State*, 269 Ga. 317, 320 (496 SE2d 896) (1998), overruled on other grounds by *Bunn v. State*, 291 Ga. 183, 184 (728 SE2d 569) (2012). Thus, it is true that the actual videotape that contained the recording of Boren's interview of Lewis was inadmissible evidence. However, during direct examination, Lewis testified without objection that he was interviewed by Boren and that the interview was videotaped. Thus, the jury had heard during testimony that there existed a videotape of Lewis's interview with Boren shortly after his apprehension. The prosecutor never made any remarks about the statements that Lewis made in the videotaped interview, as defense counsel's prompt objection was sustained. Therefore, we conclude that the prosecutor's remarks were not prejudicial within the meaning of OCGA § 17-8-75.

15. Brockman contends that the trial court erred in refusing an instruction on the affirmative defense of accident, which he alleges was his sole defense. Under OCGA § 16-2-2, "[a] person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." Accordingly, unless there was evidence to support a finding that Brockman fired the shot without any "criminal scheme or undertaking, intention, or criminal negligence," the trial court correctly refused to charge the defense of accident. Brockman points to his testimony that he had "abandoned"[8] the robbery after Lynn did not give him the money and that he was pulling the gun back inside the car when Lewis bumped him, causing him to fire the gun and shoot Lynn. However, Brockman admitted that he went to the service station with the intent to rob Lynn, that he pointed a loaded gun at Lynn, and that he twice demanded money from Lynn. He also testified that after he told Lynn, "No, you got it," Lewis began yelling to go, that his "first thought was that a policeman

---

[8] The trial court instructed the jury on the affirmative defense of abandonment in relation to the charge of criminal attempt to commit armed robbery. OCGA § 16-4-5 states that to be considered abandonment, the defendant's conduct must be "under circumstances manifesting a voluntary and complete renunciation of his criminal purpose." Further, "[a] renunciation of criminal purpose is not voluntary and complete if it results from [a] belief that circumstances exist which increase the probability of detection or apprehension of the person or which render more difficult the accomplishment of the criminal purpose." OCGA § 16-4-5 (b) (1). Even if Brockman's pulling the gun back inside the vehicle and fleeing after Lynn twice did not respond to his demands is seen as evidence of abandonment, the crime of criminal attempt to commit armed robbery was completed when Brockman pointed the gun at Lynn and demanded that Lynn turn his money over to him. See OCGA § 16-4-1; *Stubbs v. State*, 293 Ga. App. 692, 694 (2) (667 SE2d 905) (2008) (the offense of criminal attempt to commit armed robbery was completed "when the attacker demanded money and pointed a gun at the victim"). Moreover, the jury resolved the issue of whether or not Brockman voluntarily abandoned his attempt to rob Lynn by returning a guilty verdict on the charge of criminal attempt to commit armed robbery.

had pulled in behind [them]," that "at that point [he] stomped on the gas," that Lewis was hitting his shoulder as he pulled his hand back into the car, and "that's when the gun went off." Therefore, based on his own testimony, the "criminal scheme" was ongoing when Brockman shot the victim. See generally *Collier v. State*, 244 Ga. 553, 560 (3) (261 SE2d 364) (1979) ("A homicide is within the res gestae of the underlying felony for the purpose of the felony-murder rule if it is committed while fleeing the scene of the crime."). Moreover, Brockman acted with criminal negligence when he pointed the loaded gun at Lynn, rendering the defense of accident inapplicable. See *Mills v. State*, 287 Ga. 828, 832 (4) (700 SE2d 544) (2010) (For purposes of OCGA § 16-2-2, being criminally negligent means acting "in a manner showing an utter disregard for the safety of others who might reasonably be expected to be injured thereby," and no charge on accident was required where the defendant got into bed with the victim with his finger on the trigger of a loaded gun, even though he testified that the victim's pushing the gun away caused it to accidentally fire.). Accordingly, the trial court did not err in rejecting Brockman's request to instruct the jury on the affirmative defense of accident.

16. Brockman contends that the trial court erred by refusing to charge the jury on voluntary manslaughter. "A charge on voluntary manslaughter must be supported by evidence that the defendant 'act(ed) solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person.'" *Humphrey v. Lewis*, 291 Ga. 202, 211 (IV) (728 SE2d 603) (2012) (quoting OCGA § 16-5-2 (a)). Brockman contends that there was at least slight evidence to support such a charge based upon the evidence presented that Lewis, his co-indictee, had received an offer from the State to plead guilty to the lesser included offense of voluntary manslaughter rather than murder in exchange for his testimony against Brockman and the fact that the trial court charged the jury on, and Brockman was convicted of, felony murder. However, Brockman's contentions do not support his request for a voluntary manslaughter charge.

Evidence of Lewis's plea offer is irrelevant to Brockman's guilt or innocence, which had to be determined based upon the evidence introduced in his trial. See *Neal v. State*, 160 Ga. App. 834, 837 (3) (288 SE2d 241) (1982). As to Brockman's felony murder conviction, Brockman contends that the jury's verdict finding him guilty of felony murder rather than malice murder shows that the jury found that he did not act with malice. However, "a verdict of guilty for felony murder does not constitute a finding that the murder was committed without malice aforethought, but that the murder was committed while in the

commission of another felony offense *'irrespective of malice.'* " (Emphasis supplied.) *Knight v. State*, 271 Ga. 557, 559 (2) (521 SE2d 819) (1999) (quoting OCGA § 16-5-1 (c)). Therefore, "[t]he presence or absence of malice is irrelevant to commission of felony murder." Id. Nor can it be inferred from the verdict form that the jury found Brockman "not guilty" of malice murder, as Brockman contends.[9]

Furthermore, the jury did not have to find that Brockman acted with an intent to kill in order to find him guilty of felony murder, as intent to kill, like malice, is not an element of the offense of felony murder. See *Smith v. State*, 272 Ga. 874, 880-881 (6) (b) (536 SE2d 514) (2000). However, "voluntary manslaughter requires a finding by the jury that [the defendant acted] based upon the provocation and passion required under OCGA § 16-5-2." Id. There was not even slight evidence in the record of provocative conduct by the victim sufficient to warrant a charge on voluntary manslaughter. See *Nance v. State*, 272 Ga. 217, 221 (3) (526 SE2d 560) (2000) ("[A] voluntary manslaughter charge is not warranted when the only alleged evidence of provocation is the victim resisting an armed robbery."). Accordingly, the trial court did not err when it declined to instruct the jury on the law of voluntary manslaughter.

17. Brockman complains of the trial court's charge to the jury that it was allowed to infer the intent to kill from his use of a deadly weapon. At the time of Brockman's trial in 1994, this was considered a proper jury instruction. See *Wood v. State*, 258 Ga. 598, 599 (2) (373 SE2d 183) (1988). However, this Court has since ruled the charge to be error as a matter of law. See *Harris v. State*, 273 Ga. 608, 610 (2) (543 SE2d 716) (2001). We also held that this new rule applied to all cases in the pipeline. See id.; *Taylor v. State*, 262 Ga. 584, 586 (3) (422 SE2d 430) (1992) (adopting the "pipeline" approach). As this includes Brockman's case, the charge given here was erroneous. See id. Further, this issue was preserved for appellate review by defense counsel's reservation of the right to object to any charges in his motion for new trial or appeal, which was permitted under the law in effect at the time of Brockman's trial. See *Rivers v. State*, 250 Ga. 303, 309 (7) (298 SE2d 1) (1982). Compare OCGA § 17-8-58 (providing, as amended, that the failure to contemporaneously object to jury instructions precludes appellate review of the charge except in cases of plain error); Ga. L. 2007, pp. 595-597, §§ 1, 5.

---

[9] According to the trial court's instructions and the verdict form, the jury was to first determine whether Brockman was guilty or not guilty of murder, and, if the jury found him guilty of murder, to then indicate *either* malice murder *or* felony murder but not both. If the jury found Brockman guilty of felony murder, it was then to indicate whether the underlying felony was criminal attempt to commit armed robbery or aggravated assault.

Nevertheless, we have repeatedly held that the giving of such a charge is harmless error where, as here, the defendant stands convicted of felony murder rather than malice murder. See, e.g., *Ross v. State*, 276 Ga. 747, 748 (2) (583 SE2d 850) (2003). "Unlike malice murder, felony murder does not require intent to kill; rather, the defendant only must have intended to commit the underlying felony." *Oliver v. State*, 274 Ga. 539, 540 (2) (554 SE2d 474) (2001). Upon a review of the record, we further conclude that the trial court's error could not have affected the jury's consideration of the statutory aggravating circumstance in this case, as the only statutory aggravating circumstance alleged by the State was that the murder was committed while the defendant was engaged in the commission of armed robbery, which does not require the intent to kill. See OCGA § 16-8-41. Citing this Court's mandatory statutory review of all death sentences, Brockman further argues that the same jury that received the erroneous charge also returned his death sentence and, thus, that his death sentence may have been imposed "under the influence of passion, prejudice, or any other arbitrary factor"; however, we conclude that the trial court's error did not create prejudice of a type and degree that would warrant relief under OCGA § 17-10-35 (c) (1).

18. After the publishing of the jury's guilt/innocence phase verdict and prior to the beginning of the sentencing phase, defense counsel moved the trial court to direct a verdict of life imprisonment under *Enmund v. Florida*, 458 U. S. 782 (102 SC 3368, 73 LE2d 1140) (1982). The United States Supreme Court in *Enmund* held that a sentence of death violated the Eighth Amendment where the defendant was "the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." *Tison v. Arizona*, 481 U. S. 137, 149 (II) (107 SC 1676, 95 LE2d 127) (1987) (explaining *Enmund*). In his brief to this Court, Brockman acknowledges that *Enmund* does not prohibit the death sentence in his case. See *Jefferson v. State*, 256 Ga. 821, 829 (A) (353 SE2d 468) (1987). However, he now argues that the imposition of the death penalty under such circumstances violates the Georgia Constitution's prohibition against cruel and unusual punishment. See Ga. Const. of 1983, Art. I, Sec. I, Par. XVII. Because the *State* constitutional issue was not raised or ruled on below, it is waived on appeal. See *Santana v. Ga. Power Co.*, 269 Ga. 127, 129 (6) (498 SE2d 521) (1998).

Even if the issue had been properly preserved, however, Brockman's argument lacks merit. "That States have authority . . . to enact felony-murder statutes is beyond constitutional challenge." *Lockett v. Ohio*, 438 U. S. 586, 602 (98 SC 2954, 57 LE2d 973) (1978). See *Collier*, supra, 244 Ga. at 570 (16), overruled on other grounds by *Thompson*

*v. State*, 263 Ga. 23, 25 (426 SE2d 895) (1993), and disapproved on other grounds by *Satterfield v. State*, 248 Ga. 538, 541 (3) (285 SE2d 3) (1981). Georgia's felony murder statute authorizes the imposition of the death penalty if a person causes the death of another during the commission of a felony "irrespective of malice." OCGA § 16-5-1 (c), (d). Even after *Enmund*, this Court continued to hold that a death sentence was not disproportionate punishment per se for felony murder where the defendant "was an active participant in the events that led to the victim's death." *Allen v. State*, 253 Ga. 390, 395 (7), 395, n. 3 (321 SE2d 710) (1984).

Since its decision in *Enmund*, the Supreme Court has held that statutorily providing for individualized sentencing that includes the possibility of a death sentence in such cases does not constitute cruel and unusual punishment under the federal constitution. See *Tison*, supra, 481 U. S. at 158 ("[M]ajor participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement" and thus the proportionality requirement of the Eighth Amendment). Brockman offers no persuasive reason why this Court should now hold that such a sentence violates the Georgia Constitution. The evidence was overwhelming that Brockman was an active participant in the events that led to the victim's death and that he showed a reckless indifference to human life, and his sentence does not, by reason of his conviction for felony murder, violate either the federal or state constitutional prohibitions against cruel and unusual punishment. See *Jefferson*, supra, 256 Ga. at 829 (A).

### Sentencing Phase Issues

19. For the reasons discussed in Division 2 above, we reject Brockman's contention that, because he had only been indicted for and convicted of criminal attempt to commit armed robbery, the trial court erred by overruling his objection to the State's alleging in the sentencing phase the (b) (2) statutory aggravating circumstance that the murder was committed while he was engaged in the commission of armed robbery. Nor, for the reasons discussed in Division 18 above, do we find any merit in Brockman's contentions based on the fact that he was convicted of felony murder rather than malice murder.

20. Brockman contends that the trial court erred in its sentencing phase preliminary charge to the jury because its instructions did not explain the purpose of the evidence to be presented. The trial court's instructions substantially followed the suggested pattern instructions and thus included an explanation of the bifurcated nature of the trial and "the right of the State and the accused to

submit additional evidence in aggravation and mitigation of the punishment to be imposed." See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.15.20 (4th ed.). The trial court explained to the jury immediately prior to Brockman's introduction of evidence in mitigation that the defense was going to present "additional evidence . . . in extenuation and mitigation of any punishment." Therefore, "even if a juror did not understand the term 'mitigati[on],' he or she could have construed it only in its broadest possible sense, to mean *anything favorable to the defendant*." (Emphasis in original.) *High v. Zant*, 250 Ga. 693, 702-703 (17) (300 SE2d 654) (1983) (where the court's charge referred to " 'mitigating facts and circumstances, if any, *on behalf of the defendant*' ") (emphasis supplied). See *Cape v. State*, 246 Ga. 520, 526 (9) (272 SE2d 487) (1980) (" 'Mitigation' is a word of common meaning and usage. . . ."). Moreover, OCGA § 5-5-24 (b) requires only that the trial court instruct the jury on the law at the *close* of evidence. See *Williams v. State*, 277 Ga. 853, 856 (3) (596 SE2d 597) (2004); *Griffith v. State*, 264 Ga. 326, 327 (2) (444 SE2d 794) (1994). In its closing charge, the trial court adequately and properly defined mitigating and aggravating circumstances, substantially tracking the language in the suggested pattern jury charges. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.15.30 (4th ed.). We find no error.

21. Brockman contends that the trial court erred by denying his request to give an opening statement at the sentencing phase. At the time of Brockman's trial in 1994, "[a]llowing opening statements at the beginning of the sentencing phase . . . [wa]s not required." *Wilson v. State*, 271 Ga. 811, 818 (8) (525 SE2d 339) (1999) (citing *Smith v. State*, 270 Ga. 240, 250 (15) (510 SE2d 1) (1998)). However, this Court overruled *Wilson* and *Smith* in *O'Kelley*, supra, 284 Ga. at 768 (3), and held "that a death penalty defendant is entitled to make an opening statement in the sentencing phase." Because Brockman's case was in the pipeline, he was entitled to claim the benefit of this new rule of criminal procedure on appeal, providing he preserved this issue for appellate review. See *Taylor*, supra, 262 Ga. at 586 (3). Pretermitting whether Brockman did so, however, we find that any error was harmless. See *O'Kelley*, supra, 284 Ga. at 769 (3) (applying harmless error analysis to the denial of the opportunity to present a sentencing phase opening statement). The trial court informed the jury at the beginning of the sentencing phase of its purpose, reminded the jury immediately before the presentation of the defense's mitigation case that the defendant would be presenting additional evidence "in extenuation and mitigation of any punishment," and charged the jury on the meaning and consideration of mitigating evidence. Brockman's mitigation defense, consisting of the testimony of his mother,

stepsister, and a correctional officer at the jail where he was incarcerated awaiting trial, "was neither unusual nor complex," and, in an extensive closing argument, defense counsel incorporated this evidence into Brockman's mitigation theory. *O'Kelley*, supra, 284 Ga. at 769 (3). Therefore, this enumeration provides him no relief.

22. Brockman contends that the trial court erred in admitting a prior conviction as evidence in aggravation. Brockman never objected to the admission of this evidence on the basis that his guilty plea was not knowingly and voluntarily entered and, therefore, this enumeration of error is waived. See *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992); *Pope v. State*, 256 Ga. 195, 209 (17) (345 SE2d 831) (1986) ("[O]nce the defendant *raises the issue of intelligent and voluntary waiver* with respect to prior guilty pleas, the burden is on the state to establish a valid waiver" (emphasis supplied)), overruled in part by *Nash v. State*, 271 Ga. 281, n. 1 (519 SE2d 893) (1999) ("*Pope* remains the controlling authority as to the admission of guilty pleas in the sentencing phase of death penalty cases.").

23. Brockman contends that the trial court erred by refusing to give his sentencing phase requests to charge. We find no error.

(a) The trial court did not err in refusing to charge the jury that it could impose a life sentence based solely on mercy.

> [T]he trial court's charge to the jury, which stressed that they should consider any mitigating evidence and that they could impose a sentence less than death for any or no reason, was an appropriate instruction that sufficiently informed the jury of its relevant duties in deciding [Brockman's] sentence.

*King*, supra, 273 Ga. at 277 (38).

(b) The trial court did not err by refusing to charge the jury that the sentencing procedure is not merely counting aggravating circumstances versus mitigating circumstances. The sentencing procedure "was adequately explained by the charge given, in which, among other things, the jury was told that it could recommend a life sentence whether or not it found mitigating circumstances to exist." *Curry v. State*, 255 Ga. 215, 223 (6) (336 SE2d 762) (1985).

(c) "The trial court did not err by declining to charge the jury on the specific mitigating circumstance of residual doubt but, instead, charging the jury on mitigating circumstances in general." *King*, supra, 273 Ga. at 277 (39). See *Carruthers v. State*, 272 Ga. 306, 317 (18) (528 SE2d 217) (2000), overruled on other grounds by *Vergara v. State*, 283 Ga. 175, 177 (1) (657 SE2d 863) (2008).

(d) Brockman contends that the trial court's "repeated" use of the term "recommend" when addressing the jurors' authority to impose a sentence unconstitutionally lessened their sense of responsibility for determining the appropriateness of a death sentence, relying on *Caldwell v. Mississippi*, 472 U. S. 320, 323 (105 SC 2633, 86 LE2d 231) (1985) (death sentence imposed by a jury that was led to believe that responsibility for determining the appropriateness of a death sentence rested elsewhere violated the Eighth Amendment). Thus, he contends that the trial court erred in refusing to charge the jurors that their sentencing verdict would be binding and that they must presume that any sentence they imposed would be carried out.

The trial court instructed the jury as follows:

> [A] sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that one or more statutory aggravating circumstances exist, . . . recommends the death sentence in its verdict[, a]nd designates in its verdict the statutory aggravating circumstance, which it so finds from the evidence to exist in the case beyond a reasonable doubt.

The trial court also charged the jury that, if they found for life imprisonment, "the defendant would be sentenced to serve the remainder of his life in the penitentiary" and that, if they found for the death penalty, "the defendant would be sentenced to be put to death in the manner provided by law." The sentencing charge concluded with the following language: "Whatever penalty is to be imposed within the limits of the law as I've instructed you is a matter solely for you, the jury, to determine." Accordingly, when viewed as a whole, the jury charge did not

> give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eighth Amendment's heightened "need for reliability in the determination that death is the appropriate punishment in a specific case."

*Hill v. State*, 263 Ga. 37, 41 (7) (427 SE2d 770) (1993) (quoting *Caldwell*, supra, 472 U. S. at 340). See *Taylor v. State*, 261 Ga. 287, 297 (14) (404 SE2d 255) (1991) (instruction that a death sentence will not be imposed unless the jury " 'recommends the death sentence in its verdict' " clearly informed the jury that its recommendation would be binding).

24. During his closing, the prosecutor argued that Brockman's stepfather and half-brother "d[id]n't even care enough about him to

come down here to a trial where he could receive a death sentence" and that they were "probably happy that he ain't around the house, and they got a lot of reasons —." At that point, defense counsel objected on the ground that the State's argument was improper speculation and, thus, constituted evidence that was not before the jury. The trial court ruled, "It is not in evidence." Brockman contends that the trial court failed to rebuke the prosecutor and to give a curative instruction or to declare a mistrial when the prosecutor argued prejudicial matters not in evidence. See OCGA § 17-8-5; *O'Neal*, supra, 288 Ga. at 221-222 (1).

While the trial court erred by failing to fulfill its statutory duty here, we conclude that it is highly probable that the error did not contribute to the verdict. Considering the brevity of the prosecutor's comment, the overwhelming evidence of Brockman's guilt, the evidence of Brockman's prior crimes, the fact that the trial court specifically pointed out to the jury that the prosecutor was commenting on matters not in evidence, and the fact that the trial court instructed the jury that the closing arguments of counsel did not constitute evidence, we conclude that it is highly probable that the trial court's error did not contribute to the verdict. See *Arrington v. State*, 286 Ga. 335, 346 (16) (a) (687 SE2d 438) (2009).

25. Brockman contends that the trial court erred by denying his objections to the verdict form. We find no error.

(a) Brockman's first objection to the verdict form is based on the State's reliance on the (b) (2) statutory aggravating circumstance involving armed robbery. First, he contends that the State could not prove the crime of armed robbery but only the crime of criminal attempt to commit armed robbery. However, again, as explained in Division 2, OCGA § 17-10-30 (b) (2) does not require that the defendant be convicted of armed robbery, as "a murder may be found to have been committed while the murderer was 'engaged in the commission' of an armed robbery even if the attempted armed robbery fails or is otherwise abandoned." *Tate*, supra, 287 Ga. at 368 (5) (citations omitted). There also is no merit to Brockman's contention that the trial court erred in allowing armed robbery to serve as a statutory aggravating circumstance because the criminal attempt to commit armed robbery conviction, as the underlying felony for his felony murder conviction, would merge with his felony murder conviction. Brockman's conviction for criminal attempt to commit armed robbery did not make him death eligible. Instead, it was a question of fact for the jury to determine beyond a reasonable doubt whether Brockman was engaged in the commission of an armed robbery at the time that he murdered the victim. See *Jefferson*, supra, 256 Ga. at 829 (B) (rejecting defendant's argument that it was error to allow armed

robbery to serve both as a basis for a defendant's conviction for felony murder and as a statutory aggravating circumstance).

(b) We also reject Brockman's contention that the trial court erred in including the terms "murder" and "criminal attempt armed robbery" in the style of the case on the verdict form. Felony murder *is* murder, see OCGA § 16-5-1 (c), and even though the criminal attempt to commit armed robbery conviction would eventually merge with Brockman's felony murder conviction during final sentencing by the trial court, see *Hawkins v. State*, 267 Ga. 124, 124 (2) (475 SE2d 625) (1996), Brockman was charged with and found guilty of that felony under the same indictment as the one under which he was being tried as to sentence for the murder. Moreover, when introducing the verdict form to the jury during its charge, the trial court pointed out the fact that the style on the form read "murder and criminal attempt armed robbery," explained that the language was "primarily for filing purposes because that's the way the original indictment read," and instructed the jury that it was to only be concerned with "this felony murder conviction." Thus, the jury could not have been misled by the style of the case on the verdict form.

(c) Before the verdict form was provided to the jury, the trial court inserted the words, "and find for imposition of," after the words, "We the jury recommend," and before the sentencing options. Because the sentence returned by the jury *is* the sentence imposed, see OCGA § 17-10-31 (a), Brockman contends that the phrase misled the jury to believe that the responsibility for its sentencing decision rested elsewhere, citing *Caldwell*, supra, 472 U. S. at 328-329. Brockman did not object to this portion of the verdict form, and this argument is waived. See *Jones v. State*, 273 Ga. 231, 235 (7) (539 SE2d 154) (2000). Even if the argument were not waived, however, it would still be meritless. "[W]here the state seeks the death penalty and follows the procedure provided for in OCGA § 17-10-30, . . . the jury may make a binding recommendation of life or death, [but] it does not impose the sentence." *Spivey v. State*, 253 Ga. 187, 192 (5) (319 SE2d 420) (1984). Thus, the verdict form was not improper. Nor was the jury misled as to its responsibility, because, as discussed in Division 23 (d) above, it was clear from the charge that the recommendation would be binding on the trial court.

26. For the reasons discussed in Division 2, the trial court did not err in charging the jury on the statutory aggravating circumstance that the offense of murder was committed while the offender was engaged in the commission of the capital felony of armed robbery. See OCGA § 17-10-30 (2) (b).

27. The trial court did not err by accepting the jury's verdict for the death penalty based upon the jury's finding beyond a reasonable

doubt that Brockman was engaged in the commission of the capital felony of armed robbery at the time of the commission of the murder, even though an element of armed robbery, i.e., a taking, was admittedly absent. As explained in Division 2 above, OCGA § 17-10-30 (b) (2) does not require that the defendant be convicted of the other felony, and there was sufficient evidence to authorize the jury to find beyond a reasonable doubt that Brockman murdered the victim while he was engaged in the commission of armed robbery.

*Sentence Review*

28. As discussed in Division 2 above, we reject Brockman's argument that the State failed to prove the sole statutory aggravating circumstance alleged in this case because the evidence showed that he committed criminal attempt to commit armed robbery rather than armed robbery. The evidence presented at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Brockman was engaged in the commission of an armed robbery when he shot the victim, see Division 1, and thus to find beyond a reasonable doubt the existence of the statutory aggravating circumstance in this case. See *Ring v. Arizona*, 536 U. S. 584 (122 SC 2428, 153 LE2d 556) (2002); *Jackson*, supra, 443 U. S. at 307; OCGA § 17-10-35 (c) (2).

29. Brockman contends that his death sentence is disproportionate and was imposed under the influence of passion, prejudice, or some other arbitrary factor. In support of his contentions, he alleges that there is only one reported decision by this Court affirming the death sentence where the only statutory aggravating circumstance was the (b) (2) circumstance involving armed robbery and the evidence showed that the defendant did not actually complete the armed robbery. See *Amadeo v. State*, 243 Ga. 627, 630-631 (255 SE2d 718) (1979). He further points out that the death sentence in that case was subsequently reversed on federal habeas review on other grounds. See *Amadeo v. Zant*, 486 U. S. 214 (108 SC 1771, 100 LE2d 249) (1988). The crux of Brockman's argument is that the death penalty is not appropriate punishment in his case because he did not complete the armed robbery. However, it is not uncommon for an armed robber's priorities to shift from completing the robbery to escaping from the scene once he has murdered the victim. The jury was authorized to conclude from the evidence presented at trial that Brockman acted accordingly. Nothing diminishes his culpability in the murder and the appropriateness of the death sentence in his case. Moreover, "[b]ecause it is a jury's reaction to the evidence before it that concerns this Court in its proportionality review," we consider it

irrelevant that the sentence in *Amadeo* was reversed "for reasons unrelated to the juries' reactions to the evidence." *Davis v. Turpin*, 273 Ga. 244, 246 (2) (539 SE2d 129) (2000) ("[I]t is irrelevant if the sentences in the cases used for comparison [in this Court's proportionality review] were already at the time, or later are, reversed for reasons unrelated to the juries' reactions to the evidence.").

Brockman also contends that juries in a number of recently tried cases involving murder and armed robbery with facts more egregious than those present in his case were not asked to return a death sentence. However, the appropriate inquiry is whether " 'the reaction of the sentencer to the evidence before it . . . is substantially out of line with reactions of prior sentencers. . . .' " *Davis*, supra, 273 Ga. at 245 (2) (citation omitted). See *Gissendaner*, supra, 272 Ga. at 717 (19) (a) ("[O]ur review concerns whether the death penalty 'is excessive per se' . . . and not whether there ever have been sentences less than death imposed for similar crimes."). " '[J]uries find the death penalty to be appropriate punishment where an adult defendant commits murder during an armed robbery.' " *Spivey*, supra, 253 Ga. at 207 (20) (citation omitted).

The evidence showed that Brockman had participated in two burglaries and four completed armed robberies before the attempted armed robbery and murder of Lynn, that he was free on bond on charges stemming from one of these crimes at the time of this incident, and, according to Brockman's own testimony, that he had pointed a loaded gun at three robbery victims and demanded their money. The evidence also showed that Brockman used a car that he had stolen to commit his crimes, that he obtained additional guns to use in planned robberies, that he sought out the victim to rob, that he bragged that he shot the victim to prevent him from "laugh[ing] about [Brockman's unsuccessful robbery attempt] with his buddies," that he was "calm and easy . . . just like it was like a joke or something funny" and just "jawed and smiled" immediately after the shooting, and that he endangered the lives of others by fleeing at a high rate of speed after the shooting and refusing to surrender to authorities until he was overcome by tear gas and had no way of escape. Lewis testified that Brockman considered shooting at the pursuing officers with the sawed-off shotgun, and one of those officers, who later participated in Brockman's apprehension, testified that Brockman told him, "I started to stick a shotgun out the window and take a shot at y'all." The cases in the Appendix support the imposition of the death penalty in this case in that all involve an unprovoked killing of a robbery victim in which the defendant received a death sentence. "[Brockman's] death sentence is not excessive or disproportionate, simply because he was convicted of *felony* murder rather than malice murder." *Blankenship*

*v. State*, 258 Ga. 43, 47 (13) (365 SE2d 265) (1988) (emphasis in original). See *Jefferson*, supra, 257 Ga. at 829 (A). Reviewing similar cases, considering both the crime and the defendant, we find that Brockman's death sentence is not disproportionate under Georgia law. See OCGA § 17-10-35 (c) (3). We also conclude that Brockman's sentence was not imposed as the result of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Arrington v. State*, 286 Ga. 335 (687 SE2d 438) (2009); *Walker v. State*, 282 Ga. 774 (653 SE2d 439) (2007), disapproved on other grounds by *Ledford v. State*, 289 Ga. 70, 85 (709 SE2d 239) (2011); *Tollette v. State*, 280 Ga. 100 (621 SE2d 742) (2005); *Perkinson v. State*, 279 Ga. 232 (610 SE2d 533) (2005); *Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Terrell v. State*, 276 Ga. 34 (572 SE2d 595) (2002); *Arevalo v. State*, 275 Ga. 392 (567 SE2d 303) (2002); *Butts v. State*, 273 Ga. 760 (546 SE2d 472) (2001); *King v. State*, 273 Ga. 258 (539 SE2d 783) (2000); *Jones v. State*, 273 Ga. 231 (539 SE2d 154) (2000); *Wilson v. State*, 271 Ga. 811 (525 SE2d 339) (1999), overruled on other grounds by *O'Kelley v. State*, 284 Ga. 758, 768 (3) (670 SE2d 388) (2008); *Cromartie v. State*, 270 Ga. 780 (514 SE2d 205) (1999); *Whatley v. State*, 270 Ga. 296 (509 SE2d 45) (1998); *Bishop v. State*, 268 Ga. 286 (486 SE2d 887) (1997); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *McClain v. State*, 267 Ga. 378 (477 SE2d 814) (1996).

DECIDED MARCH 4, 2013 —
RECONSIDERATION DENIED MARCH 28, 2013.

*Hagler & Hyles, Richard C. Hagler, Jackson & Schiavone, George T. Jackson, Steven L. Sparger*, for appellant.

*Julia Fessenden Slater, District Attorney, William D. Kelly, Jr., Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Dana E. Weinberger, Sabrina D. Graham, Assistant Attorneys General, Waldrep, Mullin & Callahan, David R. Helmick*, for appellee.