**THIRD DIVISION
ANDREWS, P. J.,
DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**August 30, 2013**

# In the Court of Appeals of Georgia

A13A1041. MUSE v. THE STATE.

DILLARD, Judge.

Following a trial by jury, Preston Muse was convicted of criminal attempt to commit aggravated child molestation and criminal attempt to commit child molestation. On appeal from these convictions, Muse asserts that (1) the State failed to prove that he did not abandon the attempts and (2) he is entitled to a new trial in light of newly discovered evidence. For the reasons set forth *infra*, we affirm Muse's convictions.

Viewed in the light most favorable to the jury's guilty verdict,[1] the record reflects that in June 2010, a member of a north Georgia internet-crimes-against-children task force created a fake Craig's List post to which Muse responded, and the

---

[1] *See, e.g.*, *Castaneira v. State*, __ Ga. App. __, __ (740 SE2d 400) (2013).

two continued to communicate via e-mail. The task-force member posed as "Father Dave," the stepfather of a fictional minor girl, and offered to allow Muse to engage in sexual contact with the child.[2] Although the initial internet advertisement did not specify the age of the female that would be involved in an encounter, the reply to Muse's response made clear that the participant would be a 14-year-old girl. Thereafter, Muse expressed surprise at the girl's young age but nevertheless continued to communicate with Father Dave, requesting proof that Father Dave was not associated with law enforcement, sending a photograph of himself, requesting a photograph of the stepdaughter,[3] and detailing the oral and vaginal sex acts he would perform with the girl.

Over the course of several weeks, Muse contacted Father Dave multiple times to set up a time and location to meet the stepdaughter for the sexual encounter, communicating via e-mail, phone calls, and text messages. Eventually it was agreed that Muse would drive from Atlanta to a motel in north Georgia, where he would meet Father Dave and the girl.

---

[2] After the initial response, various task force members acted as Father Dave when communicating with Muse through different means.

[3] In response to this request, law enforcement sent a childhood photograph of a consenting adult female and a photograph of realistic but fake female genitalia.

On the day in question, Muse and Father Dave sent text messages back and forth regarding the details of the meeting time and location, and at one point Muse requested a nude photograph of the girl and inquired as to her hygienic habits. Although Muse indicated that he would be late to the meeting and driving a black Ford F150 truck, he showed up on time in a white GMC truck and parked outside of the room number designated by Father Dave. Five task force members arrived at the hotel parking lot at the meeting time in unmarked vehicles and wearing t-shirts that bore an FBI task force insignia on the left breast.

The lead agent posing as Father Dave and an adult female companion arrived in a silver Mazda, the type of car Muse was told to expect, and parked next to the white GMC. The agent believed he recognized Muse as the truck's occupant from the photograph Muse had provided. Thereafter, at the lead agent's request, another agent pulled into the parking space beside the Mazda, rolled down his window, examined the truck's occupant, agreed that it was Muse, and relayed same to the agent in the Mazda before returning to his original strategic parking location.

At that point, Muse exited the motel parking lot at a high rate of speed and drove onto the interstate. The agents pursued Muse, initiated a stop, and made an arrest. Muse was then taken to the FBI office and spoke with law enforcement

voluntarily. This appeal follows Muse's indictment for and subsequent conviction on charges of attempted child molestation and attempted aggravated child molestation, and the trial court's denial of his motion for new trial.

At the outset, we note that on appeal from a criminal conviction, "the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict."[4] With this guiding principle in mind, we turn now to Muse's enumerations of error.

1. Muse first argues that the evidence against him was insufficient because the State's evidence failed to prove that he did not abandon the attempted crimes of child molestation and aggravated child molestation. We disagree.

To begin with, a person commits child molestation when he or she "[d]oes any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person"[5] and commits the offense of aggravated child molestation when he or she "commits an offense of child molestation which act physically injures the child or

---

[4] *Castaneira*, __ Ga. App. at __.

[5] OCGA § 16-6-4 (a) (1).

4

involves an act of sodomy."[6] And a person commits criminal attempt when, "with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime."[7]

In the case *sub judice*, Muse was convicted of attempting to commit child molestation and aggravated child molestation on the basis of his communications with Father Dave, in which he expressed a desire to engage in sodomy and vaginal intercourse with a 14-year-old female, and his act of traveling over 90 miles to the north Georgia motel on a predetermined date and time for the purpose of same. The evidence of Muse's extensive communications expressing his sexual desires after learning the child's age and his decision to travel to an established meeting location for the purpose of engaging in the planned encounter provided sufficient evidence of a "substantial step" to sustain his convictions for attempted child molestation and attempted aggravated child molestation.[8] Nevertheless, Muse argues that he

---

[6] OCGA § 16-6-4 (c); *see also* OCGA § 16-6-2 (a) (1) ("A person commits the offense of sodomy when he or she performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another.").

[7] OCGA § 16-4-1.

[8] *See Brown v. State*, __ Ga. App. __, __ (1) (743 SE2d 474) (2013) (holding that evidence was sufficient when, after engaging in internet communications, defendant "traveled to an arranged location to have sexual intercourse with [a] 14-

5

abandoned any effort to commit the crimes when he left the motel parking lot and that the State failed to prove otherwise.

With regard to the defense of abandonment, when a person's conduct would otherwise constitute an attempt to commit a crime under OCGA § 16-4-1, "it is an affirmative defense that he abandoned his effort to commit the crime . . . under circumstances manifesting a voluntary and complete renunciation of his criminal purpose."[9] However, a renunciation is not voluntary and complete if it results from a "belief that circumstances exist which increase the probability of detection or apprehension of the person or which render more difficult the accomplishment of the

---

year-old [girl], and that this was a substantial step toward committing the offense of criminal attempt to commit child molestation"); *Castaneira*, __ Ga. App. at __ (2) (holding that evidence of attempted child molestation was sufficient when defendant engaged in sexually explicit internet communications with officer posing as 15-year-old girl, arranged to meet her for sexual encounter, and traveled to arranged meeting place); *Millsaps v. State*, 310 Ga. App. 769, 773 (3) (714 SE2d 661) (2011) ("[T]he jury's conclusion that entrapment did not occur is supported by the record evidence, including the facts that . . . [the defendant] continued communicating with [the victim], including having sexually explicit conversations with her in which he stated he wanted 'a lot of oral,' after he learned that she was 14 years old . . . [and the defendant] left his home of Tennessee to meet a purportedly 14-year-old girl in order to have sex with her . . . ."). *Cf. Dennard v. State*, 243 Ga. App. 868, 870-71 (1) (a) (534 SE2d 182) (2000) (affirming denial of general demurrer and rejecting defendant's assertion that "attempted child molestation cannot be committed except in the physical presence of the intended victim").

[9] OCGA § 16-4-5 (a).

6

criminal purpose . . . ."[10] And when a defendant raises and testifies in support of an affirmative defense, "the State has the burden of disproving that defense beyond a reasonable doubt."[11]

Here, Muse did not testify, but he argues that there was evidence at trial to show abandonment in that he left the motel parking lot. And while the evidence indeed showed that Muse left the parking lot shortly after law enforcement's arrival, the evidence also showed that the undercover agents wore t-shirts bearing a large task-force insignia on the front breast, that at least two agents in two separate cars parked next to Muse and scrutinized him to make an identification, that the two agents—one occupying a car Muse was led to believe contained "Father Dave"—communicated through open windows about Muse's identification, that the second agent moved his car back to a strategic position after identifying Muse, and that Muse left the parking lot at a "high rate of speed" almost immediately after this transpired. Additionally, the jury heard a recording of the statements Muse made to

---

[10] OCGA § 16-4-5 (b).

[11] *Bentley v. State*, 261 Ga. 229, 230 (2) (404 SE2d 101) (1991). *But cf. Perkins v. State*, 224 Ga. App. 63, 65 (2) (479 SE2d 471) (1996) ("[The defendant] left after he had completed the attempt by making a substantial step toward committing child molestation. Because the evidence showed the completed crime of attempted child molestation, it was not error to refuse to charge on abandonment.").

law enforcement following his arrest and, although Muse expressed hesitation as to whether he would have gone through with the planned acts, he did not definitively express a change of heart or explain that he left the motel because of same. Although he stated in the interview that he did not pay attention to the cars around him and left because he did not feel "right," the lead agent testified that he and Muse looked at each other for "a long time."

Based on the foregoing evidence, even if the jury did not conclude that Muse knew that the individuals in the cars were law-enforcement officers, "[Muse] was acutely aware of the individual[s'] presence, and a reasonable jury could conclude that [Muse] believed the individual[s'] presence increased the probability of his apprehension."[12] It was for the jury to determine whether the State met any burden to disprove an affirmative defense of abandonment[13]—a determination which the jury made in the State's favor.[14] Accordingly, this enumeration of error is without merit.

---

[12] *Heard v. State*, 299 Ga. App. 44, 47 (1) (681 SE2d 701) (2009).

[13] *Bentley*, 261 Ga. at 230 (2) ("The determination of whether the State has met its burden to disprove the affirmative defense is for the jury . . . ."); *see also Noble v. State*, 282 Ga. App. 311, 312 (638 SE2d 444) (2006).

[14] *Cf. Brockman v. State*, 292 Ga. 707, 729 (15) n.8 (739 SE2d 332) (2013) ("Even if [the defendant's] pulling the gun back inside the vehicle and fleeing after [the victim] twice did not respond to his demands is seen as evidence of

2. Muse next argues that the trial court abused its discretion in denying his extraordinary motion for a new trial based on newly discovered evidence. Once again, we disagree.

Pursuant to OCGA § 5-5-23,

> [a] new trial may be granted in any case where any material evidence, not merely cumulative or impeaching in its character but relating to new and material facts, is discovered by the applicant after the rendition of a verdict against him and is brought to the notice of the court within the time allowed by law for entertaining a motion for a new trial.

When we review the denial of an extraordinary motion for new trial based on newly discovered evidence, our review "is circumscribed because motions for new trial on this ground are addressed to the sound discretion of the trial judge, and a refusal to grant the motion will not be reversed unless that discretion is abused."[15]

---

abandonment, the crime of criminal attempt to commit armed robbery was completed when [the defendant] pointed the gun at [the victim] and demanded that [the victim] turn his money over to him. Morever, the jury resolved the issue of whether or not [the defendant] voluntarily abandoned his attempt to rob [the victim] by returning a guilty verdict on the charge of criminal attempt to commit armed robbery." (citations omitted)).

[15] *Fetter v. State*, 271 Ga. App. 652, 653 (610 SE2d 615) (2005) (punctuation omitted).

And our Supreme Court has held that a new trial may be granted on the basis of newly discovered evidence when the party seeking a new trial satisfies the lower court

> (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that it is so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be procured or its absence accounted for; *and* (6) that a new trial will not be granted if the only effect of the evidence will be to impeach the credit of a witness.[16]

And here, the State discovered, following Muse's convictions, that the Craig's List posting presented to the jury at trial was not the posting to which Muse responded. Upon learning this, Muse made an extraordinary motion for new trial pursuant to OCGA § 5-5-23. He asserted before the trial court, and continues to assert before this Court, that the language in the posting presented at trial—as opposed to the posting to which he actually responded—strongly implicated that it sought a participant for a potentially illegal encounter and was, thus, more incriminating.[17]

---

[16] *Timberlake v. State*, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980) (emphasis added) (punctuation omitted); *accord Fetter*, 271 Ga. App. at 653.

[17] We note that Muse has never asserted that the State acted in bad faith in presenting an erroneous internet posting, and the State explained at the motion-for-new-trial hearing that the error was attributable to the task force having provided an

10

The record reflects that the State presented the jury with the following internet post as being that to which Muse responded:

> Looking for a special bread [sic] of man who would be interest [sic] in helping me with the training of my y0u ng [sic] female friend. Must be someone who is completely open minded and who understand [sic] the importance of teaching the finer aspects of womanhood. I am completely straight and there will be no male to male contact, but I will be there to watch. If you are looking for a special adventure ... drop me a line.

However, the posting to which Muse actually responded, which was titled "Interested in Fa/Dau Meeting??," read as follows:

> A truely [sic] unique opportunity for the right man. I'm a 55 year old [white male] who really likes to watch. My partner is a daughter type who likes to be watched. If any of this seems interesting to you[,] drop me a [message] and we can talk about it.

The trial court denied Muse's extraordinary motion for new trial, determining that Muse had knowledge of the correct posting prior to trial and that, even if he did not, the correct posting was not so material as to produce a different result. The trial court did not abuse its discretion in making this determination. Indeed, Muse was the

---

incorrect posting and that the State discovered the error during the prosecution of a subsequent case and immediately notified Muse and the court.

party who actually responded to the Craig's List post and, accordingly, was necessarily aware of its content.[18] And furthermore, even if Muse's first argument did not strain credulity, the trial court clearly did not abuse its discretion in determining that the content of the correct internet posting was not so material as to produce a different result. As noted by the trial court, Muse learned that the intended participant would be a 14-year-old girl only *after* responding to the initial post, and it was at that point he expressed his sexual desires, sought repeatedly to set up a sexual encounter through Father Dave, and actually arrived at a scheduled meeting time and location to engage in same. Therefore, the contested evidence is not so material that it would probably produce a different result.[19]

---

[18] *Cf. Fetter*, 271 Ga. App. at 653 ("[The defendant], who himself was present and was necessarily aware of [the potential witness's] immediate presence during the conversation, knew prior to trial that she could have testified to that conversation."); *Davis v. State*, 221 Ga. App. 375, 377-78 (471 SE2d 307) (1996) (holding that defendant's presence and knowledge of potential witness's involvement in incident precluded defendant from establishing first *Timberlake* factor).

[19] *Cf. Brinson v. State*, 288 Ga. 435, 436-37 (3) (704 SE2d 756) (2011) (holding that a receipt showing that defendant picked up food from a restaurant at around 8:30 p.m. was not material because the shooting for which defendant was convicted did not occur until 10:30 p.m. and, thus, the receipt did not impact whether defendant had time to commit the shooting). *Compare State v. Simmons*, __ Ga. App. __, __ (742 SE2d 505) (2013) (holding that defendant was entitled to new trial because newly discovered phone records corroborated testimony as to defendant's alibi); *Lee v. State*, 146 Ga. App. 189, 192 (III) (245 SE2d 878) (1978) (holding that

Accordingly, for all the foregoing reasons, we affirm Muse's convictions.

*Judgment affirmed. Andrews, P. J., and McMillian, J., concur.*

---

defendant was entitled to new trial because newly discovered eyewitness testimony that victim raised a gun toward defendant constituted material evidence supporting defendant's self-defense theory).