**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 1, 2014**

# In the Court of Appeals of Georgia

A14A0531. SULLIVAN v. THE STATE.

DILLARD, Judge.

Following a trial by jury, Michael Sullivan was convicted of influencing a witness. On appeal, Sullivan contends that (1) the trial court erred by permitting the State to admit portions of confidential conversations between himself and his private investigator; (2) the trial court erred by denying him the opportunity to impeach a State witness with portions of an audiotape; and (3) that the evidence is insufficient to sustain his conviction. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the record shows that prior to the incidents in question, the victim in this case accused Sullivan of rape.[2] In the aftermath of this accusation, a private investigator was hired to assist in Sullivan's criminal defense. This private investigator made contact with Jimmy Roberts, who had witnessed some portions of the events relevant to the investigation, and arranged to meet with him in person.

During the investigator's meeting, Roberts mentioned that he knew the victim and her family, that he doubted her version of events, and that he believed she was probably seeking a monetary payout. Accordingly, Roberts suggested offering the victim money, volunteered to act as a go-between, and indicated that he had previously been involved as the middleman in a similar negotiation. Indeed, while he was still meeting with the investigator, Roberts (on his own initiative) called the victim's daughter, who he had formerly dated, and left a voice message for her to call him back.

---

[1] *See, e.g., Muse v. State*, 323 Ga. App. 779, 780 (748 SE2d 136) (2013).

[2] Sullivan was subsequently indicted for rape and, after the trial in the case *sub judice*, was tried and acquitted of that charge.

The private investigator, while still meeting with Roberts, called Sullivan to relay this information, and Sullivan told the investigator that he wanted to meet with Roberts later that evening. During that same conversation, and in Roberts's presence, the investigator advised Sullivan that he did not believe Sullivan needed to pursue the case in such a manner, that it was in his best interest to let an attorney handle the matter, and that he would not attend Sullivan's meeting with Roberts. Nevertheless, the investigator gave Roberts directions to Sullivan's house, and Sullivan and Roberts met later that evening.

According to Roberts, at that meeting, the two men discussed what occurred the night of the incident that led to the victim's allegations, and Sullivan said that he wanted the charges "gone" and that the situation was causing him significant personal hardship. In that regard, Sullivan indicated that he wanted Roberts to contact the victim to see about having the charges dropped. Roberts asked Sullivan if he should do anything to encourage the victim to drop the charges and Sullivan responded that he should not; however, Sullivan then pulled out two thick stacks of $100 bills, slapped the money in his hand, and told Roberts that "money is not a problem." And although Roberts testified that Sullivan never indicated who the money was for, Sullivan told Roberts that if the victim did not drop the charges, he would expose her

to the media and file a civil suit against her. Then, later that evening, Roberts left Sullivan's home with an oil painting that Sullivan gave him after telling Roberts that he could provide him with access to private clubs, security, limousines, and boats.

Shortly thereafter, Roberts made contact with the victim and then met with her at her home. During this meeting, Roberts told the victim that he had been approached by a private investigator and falsely stated that he had been sent to speak with her by the investigator, not Sullivan, because that was "how he handles these situations." Roberts informed the victim that Sullivan "wanted to publicize" her name and that he (Sullivan) was "willing to give [her] money." He then asked how much money the victim wanted and "threw a number at her," suggesting $10,000. The victim appeared to be taken by surprise by Roberts's offer and told him that she would need to think about it further. Then, after leaving, Roberts called Sullivan to relay that the victim was considering dropping the charges. Roberts also called the private investigator, who, once again, informed Roberts that he wanted no part in the scheme.

The next day, the victim contacted Roberts and the two continued their communications, with Roberts persistently suggesting that the victim could receive up to $10,000 for dropping the charges against Sullivan—*i.e.*, by telling the district

attorney's office that the sexual encounter was consensual. But unbeknownst to Roberts, after his initial contact with the victim at her home, she contacted law enforcement to report that she had been approached by Roberts to drop the charges in exchange for a monetary payout. And at the request of law enforcement, all future communications between Roberts and the victim were audio- or video-recorded. Eventually, Roberts and the victim met in person for a second time, and Roberts was apprehended by law enforcement immediately after that meeting, during which he again suggested that he could get Sullivan to compensate the victim for dropping the charges against him.

Prior to his second in-person meeting with the victim, Roberts was again in contact with Sullivan, who informed Roberts that he had no intention of paying the victim and that he wanted Roberts to record her saying that she would accept money in exchange for dropping the charges. To that end, Sullivan provided Roberts with a tape recorder to use during his in-person meeting with the victim, and Roberts had the tape recorder on him when he was apprehended by law enforcement.

Following his arrest, Roberts was enlisted by law enforcement to assist in apprehending Sullivan. And after informing Sullivan that he had recorded the victim saying that she would accept money in exchange for dropping the charges, Roberts

set up a meeting to return the tape recorder. This meeting was conducted at a restaurant under law-enforcement surveillance while Roberts wore a wire, but instead of Sullivan, Sullivan's wife arrived to retrieve the recorder. Roberts handed over the recorder to Sullivan's wife, and she, in turn, handed him a $100 bill. Sullivan's wife was then arrested as she returned to her vehicle with the tape recorder, and Sullivan was apprehended shortly thereafter. Both Roberts and Sullivan's wife pleaded guilty to charges of influencing a witness and testified at Sullivan's trial.

Sullivan was ultimately charged with two counts of influencing a witness and convicted on both, although the trial court later directed a verdict as to the first count. He now appeals his conviction on the second count, contending that (1) the trial court erred by permitting the State to admit portions of confidential conversations with his private investigator; (2) the trial court erred by denying him the opportunity to impeach Roberts with portions of an audio-taped conversation between himself and Roberts; and (3) the evidence is insufficient to sustain his conviction. We will address each of Sullivan's enumerations of error in turn.

1. Sullivan argues that the trial court erred by permitting the State to admit portions of confidential conversations that took place between himself and his private investigator by finding that the conversations fell under the crime-fraud exception to

the attorney-client privilege.[3] Specifically, he takes issue with instances in which the State elicited testimony from the private investigator that he advised Sullivan on more than one occasion that he believed the scheme with Roberts was illegal; that he, the investigator, wanted nothing to do with the scheme; and that Sullivan should let attorneys or law enforcement handle the matter.

To begin with, Sullivan is correct that conversations with a private investigator who is employed to assist in a client's defense may be protected by the attorney-client privilege.[4] However, the attorney-client privilege does not extend to communications "which occur before perpetration of a fraud or commission of a crime and which

---

[3] *See* OCGA § 24-5-501 (a) (2) ("There are certain admissions and communications excluded from evidence on grounds of public policy, including, but not limited to . . . [c]ommunications between attorney and client . . . .").

[4] *See In re Fulton County Grand Jury Proceedings*, 244 Ga. App. 380, 382 (535 SE2d 340) (2000) ("[T]his court [has] held that a statement from the defendant given to an investigator by defense counsel was a privileged and confidential communication. Courts in other states have recognized that [when] a private investigator is employed by counsel to collect and assemble facts necessary for representation in pending or anticipated litigation, the protection of the attorney-client privilege extends to confidential communications between the client and investigator." (footnote omitted)); *see also Revera v. State*, 223 Ga. App. 450, 452 (1) (477 SE2d 849) (1996) (holding that the trial court erred in "permitting the State, on cross-examination, to have the defense psychologist refresh his recollection (thereby effectively impeaching defendant) by use of a privileged and confidential communication to the attorney's investigator").

7

relate thereto."[5] This is known as the crime-fraud exception to the privilege.[6] In this regard, the privileged communication may be "a shield of defense as to crimes already committed, but it can not be used as a sword or weapon of offense to enable persons to carry out contemplated crimes against society, frauds or perjuries."[7]

Here, the trial court did not err in determining that the relevant conversations fell within the ambit of the crime-fraud exception. The record reflects that Sullivan communicated with the investigator throughout the course of the weekend during which Roberts made repeated contact with the victim at Sullivan's behest (which included offers of a monetary payout to the victim in exchange for dropping the charges), and the complained-of statements related to continuation of the plan

---

[5] *In re Fulton County Grand Jury Proceedings*, 244 Ga. App. at 382.

[6] *See id.*; *see also Rose v. Commercial Factors of Atlanta, Inc.*, 262 Ga. App. 528, 529 (586 SE2d 41) (2003) (noting that the applicability of the crime-fraud exception does not require proof of the existence of a crime or fraud to overcome the claim that a communication is privileged," but rather "depends upon whether a prima facie case has been made that the communication was made in furtherance of an illegal or fraudulent activity").

[7] *In re Hall County Grand Jury Proceedings*, 175 Ga. App. 349, 350 (2) (333 SE2d 389) (1985) (punctuation omitted); *accord Atlanta Coca-Cola Bottling Co. v. Goss*, 50 Ga. App. 637, 639 (1) (179 SE 420) (1935).

Sullivan willingly undertook with Roberts.[8] And even if the complained-of testimony did not fall under the crime-fraud exception, any error was harmless because the testimony was cumulative of other testimony.[9] Indeed, the record reflects that the investigator testified that he informed Sullivan both in private and in a telephone conversation in Roberts's presence that he advised against approaching the victim and recommended allowing attorneys or law enforcement to handle the matter, and "[t]he privilege does not extend to those situations in which third parties are present for attorney-client discussions."[10] Additionally, the investigator testified without objection

---

[8] *In re Hall County Grand Jury Proceedings*, 175 Ga. App. at 350 (1) ("[C]ommunications occurring after a fraud or a crime has been completed are privileged, but those which occur before the perpetration of a fraud or commission of a crime and which relate thereto are not protected by the privilege."); *see United States v. Neal*, 27 F3d 1035, 1048-49 (VI) (5th Cir. 1994) (holding that crime-fraud exception applied to communications in which attorney advised that he believed a scheme was illegal and that he wanted no part in it); *see also In re Grand Jury Subpoena*, 745 F3d 681, 692 (III) (B) (3rd Cir. 2014) (holding that district court did not err in finding crime-fraud exception applicable when evidence suggested that "[c]lient had already considered the advisability of [the proposed conduct], and determined that it was in his best interest to do so" before seeking "advice about the scheme's legality").

[9] *See Revera*, 223 Ga. App. at 452 (1) ("The cumulative nature of [the witness's] testimony in the case sub judice even though impermissibly refreshed by use of a confidential and privileged statement renders the error in its admission harmless." (punctuation omitted)).

[10] *Rogers v. State*, 290 Ga. 18, 20-21 (2) (717 SE2d 629) (2011).

9

that he provided Roberts with the same advice that he provided to Sullivan: that he "thought the[ ] actions were wrong and illegal" and that he "was no longer going to be involved in them in any way." Accordingly, this enumeration of error is wholly without merit.

2. Next, Sullivan contends that the trial court erred in denying him the opportunity to impeach Roberts's testimony using portions of conversations that Sullivan audio-taped between himself and Roberts.

We note that, as a general rule, admission of evidence is "a matter resting within the sound discretion of the trial court, and appellate courts will not disturb the exercise of that discretion absent evidence of its abuse."[11] Furthermore, the constitutionally improper denial of a defendant's opportunity to impeach a witness, "like other Confrontation Clause errors, is subject to a harmless-error analysis."[12] But to determine whether a constitutional error is harmless, we must consider whether the error was harmless beyond a reasonable doubt.[13] And here, we conclude that even if

---

[11] *Martinez v. State*, 306 Ga. App. 512, 525 (6) (702 SE2d 747) (2010) (punctuation omitted).

[12] *Id.* (punctuation omitted).

[13] *See Hawkins v. State*, 316 Ga. App. 415, 418 (2) (a) (729 SE2d 549) (2012) ("The correct inquiry is whether, assuming that the damaging potential of the

the trial court erred in limiting the use of the audiotape on cross-examination, any error was harmless beyond a reasonable doubt.

The record reflects that during Roberts's testimony, Sullivan sought permission to play in-person and telephone conversations that Sullivan secretly audio-taped between himself and Roberts, but the State objected. And ultimately, the trial court ruled that Sullivan could use any inconsistent statements *Roberts* made on the audiotape to impeach Roberts's testimony, but the trial court would not allow Sullivan to use any statements that *Sullivan* made on the tape because those statements, the court determined, amounted to self-serving hearsay unless Sullivan chose to testify (which he did not).

On appeal, Sullivan does not specify what portions of the audiotape the trial court erred in failing to allow him to use on cross-examination. However, at trial, Sullivan proffered the statements he wished to use and played the audiotape, which was included in the record, for the court outside of the jury's presence. Specifically, Sullivan sought to use statements in which (1) he indicated to Roberts how his life had been negatively impacted by the charges, (2) Roberts, in Sullivan's view,

_____

cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." (punctuation omitted)); *see also Stovall v. State*, 287 Ga. 415, 418 (3) (696 SE2d 633) (2010).

11

volunteered to act as an intermediary, (3) Roberts noted that he had previously acted as a middleman in a similar situation, (4) Sullivan advised Roberts that he would not offer the victim any money and "only want[ed] the truth," (5) Sullivan indicated that he wanted the victim to perjure herself, and (6) Roberts offered to "get [the victim] drunk" to get to the truth. And in a second recorded conversation with Roberts, Sullivan attempted to introduce statements in which he questioned Roberts as to how "a number even came up" during Roberts's initial communication with the victim. Sullivan also sought to use a statement made by Roberts implying that the plan all along had been to record the victim saying she would accept money in exchange for dropping the charges, not to actually pay the victim money for doing so.

After the foregoing proffer, and despite Sullivan's argument that he wished to use statements by both men to impeach Roberts by contradiction, the trial court continued to rule that *Sullivan's* statements were inadmissible hearsay and that Sullivan's use of the audiotape on cross-examination would be limited to impeaching Roberts with any of his own prior inconsistent statements.

But even if the trial court erred in limiting Sullivan's cross-examination of Roberts by determining that Sullivan's statements amounted to hearsay, the error was harmless beyond a reasonable doubt because Sullivan accomplished the same result

12

without the excluded statements. Indeed, while cross-examining Roberts, Sullivan was permitted to play for the jury portions of the audiotape in which Roberts indicated that he could wear a wire when he met with the victim, get the victim intoxicated, and get the truth out of her. Sullivan also played a portion of the recordings in which Roberts's statements implied that the idea to audio-record the victim was not an afterthought in the plan.

In addition to this impeached testimony, Sullivan elicited testimony on cross-examination that Roberts "made the pitch" to the victim "the way he thought it should be done," that Sullivan instructed him to get the victim on tape saying that she would accept money and to then inform her that Sullivan had no intention of making payment, and that the plan was to record the victim and to then take the recording to Sullivan's attorney. Further, Roberts testified that it was his idea to offer the victim $10,000, and that he only suggested that number based on the stacks of cash Sullivan produced during their first meeting. Additionally, the private investigator provided testimony that Roberts volunteered for the job and indicated that he had been involved in a similar negotiation in the past. Accordingly, even without the use of Sullivan's recorded statements, he elicited the sought-after testimony to undermine

13

the State's theory of the case and Roberts's testimony, making any error by the trial court in limiting use of the audiotape harmless beyond a reasonable doubt.[14]

3. Finally, Sullivan argues that the evidence is insufficient to sustain his conviction for influencing a witness. We disagree.

We first note that on appeal from a criminal conviction, "the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict."[15] In the case *sub judice*, Sullivan was indicted for and convicted of violating OCGA § 16-10-93 (a) by "unlawfully offering [the victim] $10,000, a benefit, reward and consideration[,]" and doing so "with the intent to deter [the victim], a witness, from testifying freely, fully, and truthfully to a matter pending before the Forsyth County Grand Jury."[16]

---

[14] *See Gaither v. State*, 259 Ga. 200, 201 (2) (378 SE2d 464) (1989) ("[E]ven if the court did err in restricting [the appellant's] cross-examination of the witness, the error was harmless in view of the fact the testimony sought to be elicited by [the appellant] from this witness would have been cumulative of other testimony."). *Cf. Mangum v. State*, 274 Ga. 573, 577 (2) (555 SE2d 451) (2001) (holding that error in limiting defendant's ability to potentially cross-examine State witnesses with pending criminal charges was not harmless when conviction was based largely on circumstantial evidence and hearsay testimony elicited from those witnesses).

[15] *Castaneira v. State*, 321 Ga. App. 418, 418 (740 SE2d 400) (2013).

[16] *See* OCGA § 16-10-93 (a) (providing that a person, "with intent to deter a witness from testifying freely, fully, and truthfully to any matter pending . . . before

Although it is undisputed that Sullivan had no direct contact with the victim, the jury was charged that he could be convicted as a party to the crime. Indeed, every person concerned in the commission of a crime is "a party thereto and may be charged with and convicted of commission of the crime."[17] And a person is concerned in the commission of a crime if he "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime."[18]

Here, even if Roberts initially volunteered to approach the victim and the idea to offer the victim $10,000 was born out of Roberts's mind, the evidence before the jury showed that Sullivan responded to Roberts's suggestions by encouraging him to contact the victim about dropping the charges and vaguely indicated that "money was not a problem" after showing Roberts a significant amount of cash. Roberts also testified that when Sullivan spoke to him after his initial contact with the victim, Sullivan told Roberts to keep communicating with the victim and, rather than contact

---

a grand jury, communicates, directly or indirectly, to such witness any threat of injury or damage to the person, property, or employment of the witness or to the person, property, or employment of any relative or associate of the witness or who offers or delivers any benefit, reward, or consideration . . . shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years").

[17] OCGA § 16-2-20 (a).

[18] OCGA § 16-2-20 (b).

law enforcement for assistance in his alleged sting operation, Sullivan continued to use Roberts as a middleman. Accordingly, the jury was presented with sufficient evidence by which to find that Sullivan violated OCGA § 16-10-93 (a) as a party to the crime.

For all of the foregoing reasons, we affirm Sullivan's conviction.

*Judgment affirmed. Doyle, P. J., and Miller, J., concur.*